Judge Maeshali,
delivered the opinion of the Court.
This petition (filed under t'he new Code of Practice) •claims to recover from Shanks the value of the plaintiff’s slave Berry, alleged to have been induced, persuaded and hired by the defendant, without the authority or permission of the plaintiff, to ride a.nd swim the defendant’s horse in a certain deep and dangerous pond, •&c., whereby the slave was drowned. The answei of the defendant denies the allegation as made, but says he offered to give Berry twenty-five cents to have his horse swum, and Berry said he would do it for twmnty-five cents, and some one present remarked that Berry could not swim, and defendant then told him if he could not swim not to attempt to swim his horse; but. the slave, not regarding defendant’s command, admonition and advice, forced the horse into the pond and attempted, without the direction or request of the defendant, to ■duck the horse, and in doing so was thrown, or got off the horse, and was drowned. The defendant also states that Berry was in the habit of hiring himself to do jobs, ■&c., and also of trading for himself, by the permission ■of his master.
The affirmative matter of the answer was traversed by the plaintiff, except as to the alleged attempt of Berry to duck the horse; and the law and facts having been submitted to the Judge, he was of the opinion that the drowning of Berry did not proceed immediately from the inducement held out by Shanks for him to swim the horse, but resulted from the voluntary attempt of Berry to duck the horse, and on this ground rendered a judgment for the defendant.
The substance-of the prooí.
The evidence conduced to prove that the-slave-Berry had, with the knowledge of the plaintiff,- his owner, made some trades and acquired some little money and property, there being, however, no direct evidence of the plaintiff’s knowledge of these facts. There is no proof that he had heen in the habit of hiring himself to-do jobs, &c., nor of a-ny single act of that kind. But from his having acquired a little money, &c., and from-his alacrity on the occasion now in question, it is highly probable that he had done little services for a compensation to himself, as is frequently the ease wi-th slaves. Whether these circumstances, and the prevalence of such a practice among slaves, would be sufficient ground for^nferring that he had a general license from his master to engage in these little-services for his own profit, when not actually employed in the service of his master, it is not necessary to inquire. The fact that he had habitually, or even occasionally, undertaken jobs for his own profit, without special license,or indeed at all, is itself but matter of inference.- His master’s knowledge and sanction of such- a practice is only to be inferred by the assumption of the- first inference. And even if it could be assumed, upon the ground of these vague inferences, that Berry’s master allowed him- to- engage in little services of an ordinary kind for his own profit, it could- not be assumed, in the absence of all- proof on the subject, that Berry had any license, express or implied, to engage even on Sunday, which was the day on which this transaction occurred, in services of an extraordinary and hazardous character. It is in proof that his master had refused to hire him where he would be-exposed to water, in consequence of the danger of his-being drowned. And it oannot be safely inferred, that if he had been present, he would have consented that Berry should ride the defendant’s horse into the pond for the purpose of swimming him. On the contrary, it may be assumed, that if Berry could not swim himself, his master would not have permitted him to swim the horse;
From the fact that a master occasionally permitted his slave to do jobs for his own profit, it can not be inferred that he consented that he should engage in the hazardous enter-prize of swimming a horse— and the employ, ment of a slave in such an undertaking was a wrongful act, rendering the per.-on so employing him liable for any loss which might be regarded as the natural & proximate consequence thereof.
Under these views, we are of opinion that the hiring of the slave Berry to ride and swim his horse in the pond, in the absence and without the permission of his master, was an illegal and wrongful interference with and control of the slave, which, being itself an injury, rendered the wiong doer liable for any loss which may be properly regarded as the natural and proximate consequence of the illegal act. The answer of the defendant admits, in effect, the offer of a reward to Berry if he would swim the horse, or the acceptance of Berry’s offer to do it for twenty-five cents. We deem it immaterial therefore to detail the evidence on this point, further than to say, that it shows that the defendant took his horse (then about two years old) to the pond for the purpose of being swum, that he mounted him himself for the purpose, but the horse proving restive, he dismounted — that he requested another person a witness on the trial, to ride him in, but after at first assenting he declined — and that the defendant after-wards offered twelve and a half cents, to a negro, to swim the horse, when Berry coming up about this time offered to do it for 25 cents, to which the defendant agreed. This was hiring and inducing the slave to per-orm or attempt to perform the service.
The defendant relies upon a subsequent countermand, upon its being said by some one, that Berry could not swim. The testimony on this subject is, that upon this remark being made, the defendant who was then in the pond smimming himself said, as one witness who was on the shore states it; “Berry you had better not come in,” and as the other witness who was in the pond with him states, he said once or twice, “Berry if you can’t smim don’t come in.” On which Berry said “you only want to save the quarter, I intend to take that quarter,” and rode in, Shanks making no reply. The first witness states that Berry said before he rode in, that he was in the habit of swimming. And there is no proof that he could not swim. Unless as it may be inferred from the fact and manner of his *413 being drowned, which cannot outweigh his own declaration and his alacrity in riding the horse into deep water. We are of opinion that this conversation between the defendant and Berry, cannot be regarded as a reciaion of the previous hiring, or as a countermand or withdrawal of the desire and implied direction .that Berry should swim the horse. It was either mere advice or at most a countermand upon a condition the existence of which is not proved, which referring itself, as it did, to the judgment or will or knowledge of Berry himself, who had already shown himself willing to incur the risk of the desired service, left it, as it was at first, at his option whether or not he would risk the horse in for the promised reward. The defendant did not, by this advice or suggestion, relieve himself from any responsibility that might arise from his previous act. If he had any reason to suppose that Berry could not swim, it was his duty not only to have revoked his offer of a reward, but as far as he could, to have prevented the hazardous attempt which his offer had induced.
The second witness, above referred to, who was in the pond with or near the defendant, and was a witness for the defence, states that, as Berry started in, (after the conversation just stated,) he said twice', “I will duck your horse for you.” The witness, who was on the shore and was examined by the plaintiff, states that he did not hear anything said about ducking the horse. There is also some apparent discrepancy between the statement s of these witnesses with regard to the immediate circumstances of the catastrophe. The plaintiff’s witness stated, that after Berry had swum the horse about thirty yards, he pulled him round by one rein of the bridle. The horse sank his head down, Berry fell over the horse’s head, rose once, struggled awhile, and was drowned. The other witness stated, that after Berry had swum the horse a few steps, he saw him jump up far on the neck of the horse, almost to his head, and as he believed, was trying to duck the *414 horse; that both sank together — the horse came up at one place, and the boy at another; that Shanks took off his life-preserver and threw it to the boy, and it fell near him, (as to which, both witnesses concur,) but about the time it fell the boy sank, and rose no more; that he and Shanks were both afraid to go to him, and it was all over in a few moments. This witness further said, he thought at first the slave Berry was trying to duck the horse, but afterwards he was led to doubt, and said the boy might have been trying to save himself.
If Shanks heard Berry say that lie would duck his horse for him, and understood it as anything but a mere joke, or idle bravado, his failure to interpose peremptorily and actively to put a stop to the adventure, and especially if he supposed Berry could not swim, would seem to implicate him absolutely in the consequences of the attempt, if actually made, even if he were not otherwise involved, ¡^whatever consequences might ensue while the boy was engaged in performing his undertaking of swimming the horse. ’’But it is improbable, and especially if the boy could not swim, that he should have actually undertaken the perilous feat of ducking the horse. And comparing the statements of the two witnesses, we are inclined to the opinion that that the casualty occurred not from’an attempt to duck the horse, but from imprudently or unskilfully pulling him round, as described by the first witness, in consequence of which the horse’s head went down and Berry fell off. And even if he could swim, he may have been disabled by a stroke of the horse’s feet while under the water. It is not proved that , he was in the habit of swimming horses, or that he had ever Swum one before. On the other hand, it is proved that the defendant’s horse, though young, was gentle, and that he had been swum several times the day before.
If this case depended upon the question of fact, whether Berry attempted to duck the horse or not, we might feel some difficulty in reversing the judgment, on the ground that the Circuit Judge had come to an im *415 proper conclusion from the evidence. But as the second witness doubted the correctness of his own first impressions, which may have been produced by hearing Berry say he would duck the horse, we should be inclined to the opinion, as already stated, that the impressions of the first witness, who stood upon the shore, were probably most correct. We are of opinion, however, that the case does not depend upon this fact, unless upon the ground, which we reject, that the defendant, having heard and believed the threat of ducking the horse, had reason to apprehend such an attempt, and shoulá have prevented it. We put the case upon the broader ground, that the defendant having, without the consent or authority of the plaintiff, and for his own amusement or benefit, employed the slave of the plaintiff in an undertaking obviously hazardous, thereby took upon himself the risk incident to the service, and made himself responsible for any injury which the slave might sustain while engaged in the undertaking and rationally attributable to it, though the. injury might proceed immediately from his own willfullness or want of skill, and thus be attributable to more than one cause.
One who employs the slave of another in a hazaidons business, without the consent of the owner is liable for any loss that may aim, though it might be the lack of skill in the slave that produced the injury.
The case, stripped of the immaterial circumstances relied on, is simply this—that the defendant wrongfully, but without intention or expectation of evil consequences, employed the plaintiff’s slave in the hazardous undertaking of swimming the defendant’s horse in a deep pond, and that while engaged in this undertaking the slave, either in a rash attempt to duck the horse, of which it is uncertain whether the defendant had or had not notice, or from other imprudence, or from carelessness or want of skill, was drowned. It is not necessay that the death of the slave, which was the damage to the plaintiff, should have proceeded immediately or necessarily from the inducement held-out by the defendant for the undertaking of the slave, or that it should have been produced immediately by the first act to be done in the course of the undertaking, which was the mounting of the horse. The inducement offered, and *416 the injurious act of the defendant, extended t.o the •whole undertaking of swimming the horse, as long as ■it was permitted to be continued under the employment of the slave by the defendant; and the drowning, though not the necessary or expected consequence of the employment and undertaking, was directly attributable to them, though another cause, immediately connected with them, may also have co-operated in producing it. And the consequence thus connected with the wrongful act of the defendant having in fact occurred during the countenance of that act, it was sufficiently proximate to render him liable.
'Une who employs a slave withouL the consent of the owner, is liable for the loss of the ■«lave, even wilh- • out willful misconduct or culpable negligence t2 Rictmrdsarl’s S. Carolina Reports, 455; Wright vs Bray, 2 Bay. -464)— where the slave was induced to ride a race in which he was hilled. Cases to the same purport cited, 2Richard-sn’sS. Carotina Rpps. 613; Ban-son vs Berhly, ShoharVs Law ¿ftps. S. 0. 525*
In the case of Strawbridge vs Turner, &c., (9 Louisiana Reports, 213,) where the owners of a steamboat suffered the captain to employ a slave as a hand on board, without the authority or consent of his master, and the master hearing that his slave was on the boat, went there to arrest him, and the slave, in endeavoring ■to escape, jumped., or fell overboard, and was drowned, fit was held that the owner was entitled to recover the •value of the slave on the ground of the illegal employment by the captain.
In the case of McDaniel vs Emanuel, (2 Richardson’s So. Car. Reports, 455,) the plaintiff’s slave having been received and used as a hand on board of a steamboat, against the consent of his master, and having been knocked overboard and drowned, while the boat was being turned under the direction of the captain, the owners of the boat were held liable for the loss. In the opinion of the Court, it is said that if the slave was retained and used, without the consent of his master, the defendant was liable for the loss, even without wilful misconduct or culpable negligence on the part of the captain.; that such unqualified liability for the consequences of interfering with and using the property of another, was decided in the case of Wright vs Gray, (2 Bay. 464,) where Gray was held liable for having induced the plaintiff’s slave to ride a race, in doing *417 which he was killed, and that this rule of strict accountability applies emphatically to slaves.
In Duncan vs Railroad Company (2d Richardson's Reports, 613) the Railroad Company had hired the plaintiff’s slave under thengreement that he should not be employed on the cars or locomotives, but that he might be carried on the cars or locomotives from one [¡lace to another, on the railroad where his services might be required. The slave with the knowledge of the conductor, went on the cars, and was carried beyond the place at which his services were that day required, and being on the tender, jumped off while the locomotive was moving on with its usual speed, and having jumped into soft sand fell back and was crushed to death by the cars running over him, before they could lie stopped. The company was held liable on the ground that they were by their agent conveying the slave in their locomotive against and contrary to their contract with his master. “In such a case (says the Court,) it is in vain to say that the slave was a moral agent capable of wrong as well as of right action, and that he killed himself by jumping off when he ought not.”
In the case of Harrison vs (Beckley, Strobhart's Law Reports, of South Carolina, page 525,) the defendant had sold a gallon and a quart of whisky to the plaintiffs slave who left the shop without drinking any, and started to go to his masters. He became intoxicated on the way, and the next morning, the night having been misty and cold, he was found dead. The evidence conduced to prove that he died from drunkenness and exposure. The act of selling the liquor to the slave having been wrongful and illegal, the judge left it to the jury to decide whether the drinking, intoxication, exposure and death, were the natural and probable consequences of that wrongful act,"holding that if they were the defendant was answerable for the value of the slave. The jury found for plaintiff $650, and the Court of error was of opinion that the damages were not too remote. In the argument of the case just cited, *418 the counsel stated a great number of adjudged cases in illustration of the connection which must subsist between the wrongful act and the damage which ensued, in order to render the wrong-doer responsible. And the Court, in deciding the case, laid down the distinction “between cases where the damage ensues whilst the injurious act is continued in operation and force, and those w'here the damage follows after the act has ceased. In the former class (say the Court) were the cases of Wright vs Gray, (2 Bay, 464,) and all the cases which have been cited or supposed, oí slaves put, witout the -permission of the owners, on race horses, in steamboats, and on railroads — those of property injured during a deviation from the course which was prescribed concerning it, (6 Bingh. 716,) and in general all cases where unexpected damage was done, whilst an unauthorized interference with another’s rights lasted. Hence it is usually of small moment to inquire whether the damage was the natural consequence of the injury, because the immediate connexion between the wrongful act and the damage sustained, shows that the damage, how'ever extraordinary, has actually re-sulted directly from the injury.”
In the case of the Railroad Company vs Kidd, decided by this Court, (7 Dana,245,) Kidd brought an action of trover against the Company to recover the value of his slave, who,on Sunday had, without the knowledge of the agent or conductor,(as seems to have been assumed,) got -on the cars, which were going out a few miles from Lexington, to return on the same day. On the trip out, the conductor discovered that he was on the car, but did not order him off. Afterwards, under circumstances not necessary to be here stated, upon the conductor’s exclaiming, “ Boy’s, let us get down and stop the cars,” this slave, with the others, jumped off, and being inexperienced, fell, and was crushed so that he died. In animadverting upon the instructions given and refused to by the Circuit Court, this Court said, “We cannot admit that, if neither the Company nor its agent etn *419 couraged or permitted Philip (the slave) to get rn the car, nor knew that he was on it until the train had gone some miles from Lexington, the simple omission to force him off, the instant he was discovered by the agent, was, per se., a conversion of him, in judgment of law, to the use of the Company.” And again the Court suy, “According to the facts hypothetically assumed in each of the instructions, (which had been asked by the defendants and refused) the railroad agent exercised no dominion over Philip — claimed no interest in him or his services — nor either did anything, or failed to do anything, whereby he negatived the right of th.e owner, or which was inconsistent with any such right.” It was decided that the Circuit Court had erred in giving and refusing instructions, and on that ground the judgment which Kidd had recovered was reversed and the cause remanded for a new trial.
But as the whole reasoning and conclusions of this Court were based upon the assumption that no dominion or control had been assumed over the slave, and nothing done negatively or inconsistent with, the rights of the owner, the evident implication is, that if there had been a wrongful assumption of dominion or control, or any violation of the rights of the owner, the Company would have been held liable for the consequences which ensued during the continuance of such wrongful act. So in the case of Bosworth vs Brand, (1 Dana, 377,) where Bosworth had permitted his slaves to give an entertainment on his premises, where other slaves of the neighborhood assembled and were permitted to remain in violation of law, and upon the slaves attempting to escape, when a patrolling party surrounded the house, one of the patrol wantonly fired among them and killed the slave of Brand, the judgment which Brand had obtained was reversed. But it was on the ground, that although there was no alleged act on the part of the defendant, there was no illegal assumption of control'over the slave, and that the damage which had ensued was too remote, and was noi„ *420 properly speaking, caused by the illegal act. In the opinion in that case, the following language is used: “And here, in the not attending to the important, distinction between the assumption and non-assumption of legal control, lies the fallacy of the argument of the learned counsel in favor of the verdict, and exists the want of analogy between this case and all or most rf those to which he attempted to liken it.”
The case of Swigert vs Graham, (7 B. Monroe, 661,) went upon the ground that the plaintiff’s slave being, hired by his owner as a hand on a steamboat, was subject to the risks ordinary and extraordinary of that service, and that he being drowned in that service, the owners of the boat were responsible only for misconduct or culpable negligence. The case of Hawkins vs Phythian, (8 B. Monroe., 515,) was also a case of bailment, but it seems to be asserted that Bacon, who was-not a bailee, was liable for the loss of the slave, consequent upon his putting the slave upon his horse, knowing at the time that he was vicious and unmanageable..
It may be impossible to express in general terms the precise relation which should exist between an illegal act and the ensuing damage, in order to throw the responsibility on the wrong-doer. But upon the authority of the cases which have been referred to, and in view of all the principles which occur to us as applicable to the subject, we conclude that the defendant having illegally and in violation of the rights of the plaintiff employed Berry m the dangerous service of swimming his horse, though he might not have been liable if some one on shore had shot Berry while in this service, he is liable for a casualty incident to the nature of the service; and that so far as its happening or not happening may have depended upon the skill or care or prudence of Berry, or his want of these qualities, the risk was taken by the defendant, who employed him. These circumstances could only determine the degree of hazard incurred by the service, to which the peril of being drowned, however skillful a person may be in swim *421 ming, is nn incident. That the defendant dir] not ascertain the facts with regard to Bern’s skill, while it may show that he considered that there was no danger, shows also that he deemed the particular facts immaterial. And we think he stood in effect as an insurer against tite loss of Berry l>v drowning while engaged ill the service in which he had employed.
Bell, Ballinger and Varnon for plaintiff; Harlan for defendant.
Wherefore,, the judgment is reversed, and the cause remanded for a new trial, in conformity with the principles of this opinion.