KELLY
*vs.*
WHITE.

Case 16.

ORD. PET.

# W. & J. Kelly *vs.* White.

APPEAL FROM LOGAN CIRCUIT.

1. In a suit to recover the value of a slave which was hired to iron makers, to be employed in that business, and was killed by the falling of an ore bank, the execution of a note for the hire of the slave, his clothing, &c., does not preclude the introduction of parol proof of the particular manner in which the slave was to be employed by the contract made at the time of the hiring. (*Weston vs. Pollard*, 15 *B. Monroe.*)

2. If a slave be hired to be employed in a particular business, and the hirer place him to a different employment more hazardous than that agreed upon, he is to be regarded as a wrong doer; and if damage ensue the hirer will be responsible for all such injury as is the result of such employment. (*King vs. Shanks*, 12 *B. Monroe*, 410; *Duncan vs. Railroad Co.*, 2 *Richard's Rep.* 613; *Davis vs. Garret*, 2 *Bing.* 756; *Cassillay vs. Young*, 4 *B. Monroe*, 265.)

3. If one engaged in a particular business hire a slave to be engaged in that business, without restriction as to the particular branch in in which he is to be used, there is no liability for any injury that may result to the slave, unless there has been a want of reasonable care and dilligence by the hirer, such as a man would use in regard to his own property, in protecting him from the dangers incident to the employment.

4. Where there is a general hiring of a slave for a particular employment, no more particular superintendency is due from the hirer than a prudent man would use as to his own slave.

[The facts of the case appear in the opinion of the court.—REP.]

*J. R. Underwood* for appellants—

Argued : 1. That the verdict of the jury was clearly against the weight of the testimony.

2. The circuit court erred in rejecting the testimony offered by appellants to show that their habit was when a slave was hired by them to be employed in a particular business, to state that fact in the note or obligation for the hire.

3. The court erred in its instructions to the jury, given at the instance of the appellee. The proof shows clearly that the slave went into the ore pit of

his own accord, and contrary to the injunction of the superintendent, and was there killed ; and every instruction based upon the hypothesis that he was sent there improperly, and contrary to contract, was calculated to mislead the jury. The instructions should have been confined to the conduct of the appellants in putting the slave in a perilous condition.

4. The instruction is erroneous in placing the liability of the appellants upon the ground that, if the slave was not to be employed at the ore bank, and he went to the ore bank, and even contrary to express instruction, went into the pit and was killed, even without fault of appellants, they are liable because he was at the ore bank. This is denied to be the law of the case.

The court seemed to think that the fact that the slave was at the ore bank, in which he was not to work by contract, as proved by one witness, rendered the appellants liable for any injury resulting from his being at the place, resulting from any cause connected with the ore banks. There must be some connection between the violation of the contract and the consequences resulting from the slave being there. No injury could result from his presence there, or did result, but solely from his own act in going into the pit, where he was forbidden to go, and for which injury the appellants are not legally responsible. There is no pretence that there was any contract that the slave was not to go to the ore bank. The court erred in acting upon the principle that the free agency of the slave in running into danger did not excuse the hirer from responsibility resulting from that free agency, even in violation of the injunction of the manager.

5. There was no proof of any negligence on the part of the appellants in regard to the slave ; and the instruction on that subject was an error of the court calculated to mislead the jury, and in refusing and modifying those asked for by appellants.

The parol testimony to prove a restricted hiring

ought not to have been given—the parties should have been confined to the written contract.

The court is referred to the case of *King vs. Shanks,* 12 *B. Monroe,* 410, as containing the law applicable to this case.

The case of *Western vs. Pollard* has been examined—it is not a parallel case. In this case there are other obligations except that of the payment of the hire and clothing. The slave is to have two weeks of holiday. The fact that some restrictions were put upon the hirer of the slave for the year, implies that all were placed in the writing which the parties intended, and about which there was any agreement. The court are respectfully asked to review the principle recognized in that case as to the admissibility of parol proof as to the manner in which the slave was to be employed.

*W. V. Loving, R. C. Bowling* and *W. B. Jones* for appellee—

Two principal points are presented by the appellee.

1. That the slave was hired to work at a forge as expressly agreed, and that in violation of that agreement the appellants placed the slave in an ore pit, which caved in upon him and killed him.

2. That the appellants placed the slave in an ore bank to work, which is shown to be a dangerous employment, and failed to exercise that caution and care which it was their duty to have exercised for the safety of the slave. The appellants deny the truth of both grounds set out for recovery, and rely upon the fact that as a note was given for hire, which the appellants assert contains the entire contract on the subject, and object to parol testimony to show a restricted hiring. The circuit court permitted the appellee to prove what was the contract of the parties in regard to the particular business in which the slave was to be engaged, the writing being silent on that subject. To this the appellants object. The

appellee introduced parol proof conducing to show that by contract the slave was to be employed at the forge, and not at the ore banks. Upon this proof, the court below, at the instance of appellee, instructed the jury, in substance, that if they believed from the evidence that the defendants hired the boy to work at the forge alone, and that in violation of such agreement they worked him at the ore banks, and the boy was killed by the falling in of the ore bank, they must find for the plaintiff the value of the boy. This instruction was objected to by appellants.

Several questions were made under each paragraph of the petition, but the principal questions arise out of the instructions of the court, and the action of the court in admitting the parol proof of the contract as to the business in which the slave was to be employed by appellants.

The evidence on this point was conflicting, but the jury, whose province it was, decided that the preponderance of evidence was in favor of the appellee, and the court properly refused to set aside their verdict and grant a new trial.

The appellee insists that the circuit court properly admitted the parol proof to show how the slave was to be employed, for the reasons given in overruling the motion for a new trial, and this opinion is sustained by *Starkie on Ev.* p. 995; *Ib.* 1008, 1047, 1054; 1 *Greenleaf*, 442, *sec.* 302; *Ib.* 445, *sec.* 304, where it is said: "It has been held competent to prove an additional or suppletory agreement by parol; as for example, where the contract for the hire of a horse was in writing, and it was farther agreed that accidents occasioned by shying should be at the risk of the hirer. So parol evidence is admissible of a contract collateral to that contained in a deed or writing, though relating to the same subject matter. (*White vs. Porter*, 12 *East.* 578; *Seago vs. Deane*, 4 *Bingh.* 469.) The court are also referred to *Roscoe's Ev.* p. 9; *Lamaster vs. Burkhart*, 2

*Bibb*, 28; *Cage's ex'r vs. M'Gee, Ib.* 321; *Fleming's devisees vs. Harrison, Ib.* 173; *Kelly's heirs vs. Bradford*, 3 *Bibb*, 317. The latter cases show that parol evidence is not admissible to explain a contract in writing, which show what is the true rule on the subject.

The proof here adduced was not to explain or vary the writing, but to prove a contract which the parties did not attempt to put in writing, yet binding on the parties and governing their rights in the case.

We rely upon the correctness of the decision of the circuit court for an affirmance.

June 24.

Chief Justice MARSHALL delivered the opinion of the court:

This action was brought by White to recover the value of his slave Edmund, hired to the Kellys, who were carrying on iron works and hired the slave to aid in that business, in which he was killed by the falling in of the earth, &c., on the sides of a pit which had been excavated in digging and raising ore for the iron works. The plaintiff maintains that Edmund was hired under an express agreement that he should be employed only at the forge, and that he should not be put to work at the ore banks or in digging ore. The defendants insist that he was hired expressly to be employed as they might choose in their business at the iron works. They moreover rely on their note stipulating for the payment of the hire, also for clothing the slave, and for allowing him two weeks' vacation from labor in the year, as being written evidence of the contract, which excludes the addition of any other terms by parol evidence, and insist that as the restriction asserted by the plaintiff is not contained in the writing, it must be assumed that Edmund being hired to them with a knowledge of their business for which he was hired, they had a right to employ him in any part of that business in which slaves were usually employed, and subject to no liability for accidents incident to such employment, unless for want of reasonable care and

dilligence in exposing him to hazard, or in prevent-
ing injury if the hazard was necessary.

This would, in our opinion, be the true measure of
their rights and responsibilities under a general hir-
ing. (*Swigert vs. Graham,* 7 *B. Monroe,* 661.) But
if, as contended by the plaintiff, the hiring was spe-
cial and restricted, their rights and responsibilities
would be determined by the far different principles
applicable to the wrongful use or appropriation of
the plaintiff's property. There is an irreconcilable
inconsistency in the testimony of different witnesses
who depose with respect to the parol terms of the
hiring. And if they are provable by parol, still, as
they are not conclusively established by the proof,
the verdict in favor of the plaintiff, as it may have
been produced by instructions based upon the hypo-
thesis that there was no restriction, cannot stand, if
such instructions be substantially erroneous in refer-
ence to that basis.

The first question, then, is whether parol testimo-
ny is competent to prove terms of the hiring not con-
tained in the note for the hire, &c., or whether such
terms agreed on in parol can be effectual to deter-
mine the character of the hiring and the rights of the
parties. This question was decided in the affirma-
tive in the case of *Western vs. Pollard,* October 1855.
The court there say that the note for the hire, &c.,
does not contain the entire contract, and cannot be
assumed to have been so intended. And this, we
think, is evidently true, and is proved by the fact that
the note is the consideration or fruits of the hiring,
and is not the hiring itself, upon which it is founded.
The note, it is true, in the hands of the owner, as
evidence of the stipulations of the hire made in con-
sideration of the hiring, would be evidence of that
fact. But the note is the act of the hirer, and not of
the owner, and its purpose is not to grant or express
the right or interest of the hirer, but to contain the
stipulations on his part made in consideration of the
hiring, which is the act of the owner by which a tem-

1: In a suit to
recover the val-
ue of a slave
which was hired
to iron makers,
to be employed
in that business,
and was killed
by the falling of
an ore bank, the
execution of a
note for the hire
of the slave, his
clothing, &c.,
does not pre-
clude the intro-
duction of parol
proof of the par-
ticular manner
in which the
slave was to be
employed by the
contract made
at the time of
the hiring.—
(*Weston vs. Pol-
lard,* 15 *B. Mon-
roe.*)

porary right and interest are vested in the other party. It is true, the note being intended for the security of the owner, might well contain any stipulation of the hirer for the safety of the property on which the parties might agree. But it is not necessary that it should. It is from the act of the owner in hiring, and not from the note, that the hirer derives his rights, and it is by the terms of the hiring that the extent of his rights are to be determined. The hiring, and its terms or limitations, may be by parol, and yet the price to be paid, and other similar stipulations, may be, as they usually are, contained in the note executed by the hirer to the owner. We think there is nothing in the note given in this case which precludes parol proof of the terms of the hiring, and the plaintiff has a right to rely on those terms if sufficiently proved.

We have already stated the consequences of a general hiring to the defendants for their iron works. Whether the restriction claimed by the plaintiff is established by the weight of the evidence, we need not undertake to decide. There is, however, one question as to the admissibility of evidence supposed to bear upon the terms of the contract, which it is necessary to state. The defendants offered to prove by two of their agents engaged in hiring for them, and by one of whom Edmund was hired, that it was their invariable custom, or habit, whenever the hired slave was to be employed in a special service, and not otherwise, to insert the restriction in the note for the hire; and two notes containing such restriction were offered in confirmation. But the court rejected all of this evidence, and, as we think, properly. It was not shown, nor offered to be shown, that the plaintiff knew anything of this custom or habit; and its existence or observance in other cases by these agents of the defendants, did not render it incumbent on him to require it in this, nor subject him or his rights to any unfavorable inference in consequence of his omitting to do so. The habit, or custom, is as

to him *res inter alios acta*, by which he cannot be affected. He had a right to rely upon a note in the usual form as not precluding him from proving the actual contract of hiring. It may be added that the two notes prove nothing beyond the cases to which they apply, and that as the jury did not believe the direct evidence of one of these witnesses with respect to the terms of the hiring, though he was the agent in making the contract, it is not probable that his statement of his habit in other cases, or in all cases, would have had any material influence on their judgment.

Assuming, then, that the jury had a right, upon the evidence, to find as they did, that by the terms of the hiring the defendants were restricted as to the nature of Edmund's employment, and were prohibited from employing him in the ore banks in digging ore, then, upon the fact certainly proved, that he was employed in the ore banks in digging ore, it becomes necessary to consider what responsibilities the defendants came under by thus employing him in violation of their contract. And our first observation is that this employment being unauthorized by the contract which it violated, and being against the consent of the owner, the defendants, while it continued, could not, as against the owner, claim the benefit of the contract which they repudiated; and that while as hirers, having the plaintiff's property in possession for their mutual benefit, they may not have been liable at all for casualties incident to the service or use for which they held his property, unless they were occasioned by the want, or might have been prevented by the use, of ordinary care and dilligence; they were, when stripped of rights belonging to that relation, in no better condition than that of a mere wrong doer who illegally assumes the control and direction of the slave of another, and that if they did not make themselves liable for all casualties which might happen during the continuance of their wrongful assumption of control, and which produced a damage or loss to the owner, they are at least liable for all such damage or loss from

2. If a slave be hired to be employed in a particular business, and the hirer place him to a different employment more hazardous than that agreed upon, he is to be regarded as a wrong doer; and if damage ensue the hirer will be responsible for all such injury as is the result of such employment. (*King vs. Shanks*, 12 *B. Mon.* 410; *Duncan vs. Railroad Co.*, 2 *Richard's Rep.* 613; *Davis vs. Garret*, 2 *Bing.* 756; *Cassillay vs. Young*, 4 *B. Mon.* 265.)

casualties happening during the continuance of the wrong, which may be rationally traced to it and regarded as incident to the wrongful employment. This principle is fully sanctioned by the decision of this court in the case of *King vs. Shanks*, 12 *B. Mon.* 410, and is here stated in a form milder and more favorable to the defendants than would seem to be authorized by some, perhaps by most, of the cases referred to in *King vs. Shanks*. In the case of *Duncan vs. Railroad Company*, stated in *King vs. Shanks, page* 417, the railroad company was held to be liable for the death of a hired slave, &c., occasioned by his voluntarily jumping from the cars when in motion, because, in violation of the contract of hiring, he was carried on the cars beyond the place to which the contract authorized the company to carry him in that way. That, like the present, was a case of hiring. A similar doctrine is applied to the case of common carriers, in *Davis vs. Garrett*, 6 *Bingh*. 716, and in *Cassillay vs. Young & Co.*, 4 *B. Monroe*, 265. In each of which the carrier by water was held liable for a loss that occurred during a deviation which violated his contract, though the loss was immediately occasioned by a storm, and might thus have been attributed to an act of God, or to dangers incident to the navigation.

In the two last cases it was deemed sufficient that the loss occurred, though from an extraneous cause, during the continuance of the deviation or delay which constituted a breach of the contract. In the case in 4*th B. Monroe*, the court, after showing that the defendants were guilty of a breach of duty and of contract in stopping their boat at Paducah, &c., say if she had not been there they might and probably would have escaped the storm, as to the violence and extent of which there is no evidence, &c., whence it may, perhaps, be inferred that if it had been shown that the boat, if she had proceeded regularly on her voyage, would still have encountered the storm, and with the same damage to the goods, the defendants might have escaped liability. And in *Story on Bailments*, (5*th* edition, 1851,) *section* 413,

it is said to have been thought susceptible of doubt in the case of *Davis vs. Garrett, 6th Bingham,* whether, if the loss must have happened, even if there had been no deviation from the voyage, the owner of the ship would have been liable therefor, and that he was held liable because there was no proof that the loss would have happened if there had been no deviation.

The same author, in *section* 413, in treating of the duty of the hirer, as to the use of the thing hired, says : "It may be generally stated, that if the thing is used for a different purpose from that which was intended by the parties, or in a different manner, or for a longer period, the hirer is not only responsible for all damages, but if a loss afterwards occurs, though from inevitable casualty, he will generally be responsible therefor ; and that such misuse is deemed at the common law a conversion, for which the hirer is generally held liable," &c. For each of these positions a number of cases are referred to. And supposing that the words, "if a loss afterwards occur," are intended to refer to a loss occurring during the misuse of the thing hired, the general doctrine of the cases is no doubt correctly stated. In the following section the author suggests the question, how far the misconduct, or negligence, or deviation from duty of the hirer, will affect him with responsibility for a loss which must have occurred even if he had not been guilty of any such misconduct. And in that and the three following sections, he seems to maintain that there is ground in some of the cases to say that the fact supposed should be regarded as material to the question of responsibility—but considering the question as yet unsettled, he concludes with suggesting for consideration, a difference between cases of a conversion of a thing by the hirer to his own use, and those in which there is merely some negligence, or omission, or violation of duty with regard to it, not conducing to or connected with the loss.

But even if we are at liberty to follow these suggestions, they would be entitled to no possible effect in the present case, because, as to the first question, it is not shown to be even probable that the loss would have happened if the defendants had not employed Edmund in digging ore at the banks, which if forbidden by the contract was a misconduct amounting to misuser, and therefore fixing a liability which, according to the principle involved in the question, there is nothing to mitigate; and because, as to the second question, the violation of alledged duty in this case, was certainly connected with and conducive to the loss. Edmund would not have been killed by the caving in of one of the pits at the ore banks if he had not been at the ore banks. And although he may have gone into the pit contrary to orders, and his being in it was not a necessary consequence of his being or working at the ore banks, yet as it is a mere conjecture, founded on mere possibility, that he would have been in any of the pits, or even at the ore banks, if he had not been employed by the defendants in digging ore, it seems to follow, with reasonable certainty, that his being in the pit where he was crushed to death, though not the necessary, was the actual consequence of his being employed to work in digging ore at the ore banks. The order that the laborers at the banks should not go into the pits, if given, may imply not only that there was some danger in them, but that the laboring in the near vicinity produced some inclination to go into them. It at least gave the opportunity, which would not probably have existed if they had been at a distance, and engaged in a different employment.

A more minute recurrence to the facts does not weaken, but rather strengthens the inference that Edmund's death is to be attributed to the nature and place of his employment. He had been regularly at work in the pit in which he was killed, until three or four days before the accident, when the pit being

exhausted, the superintendent put him to work on the top of the bank, and, as we understand the evidence, immediately on the edge or brink of the pit, though that side of it on which he was at work did not fall in. The superintendent says that his attention was attracted by the sound of the earth cracking, and looking round he saw Edmund leaning on his shovel in the pit, and looking up at its sides. The sides fell in and he was crushed to death. The inference is that there was no possibility of saving him after he was discovered to be in the pit. But why or how he came to be there at that particular juncture is not known, nor pretended to be accounted for. He may have accidentally fallen or slipped in from his place of labor on the top of the bank, or his shovel may have fallen in, and he may have gone after it, or he may have gone into the pit in willful despite of orders, or from any other conceivable or some inconceivable motive. If it had been shown that either he or his shovel, one of the implements of his labor, had fallen into the pit in consequence of the proximity of the place at which he was put to work, this would have proved that his being in the pit was a direct though incidental consequence of the act of the plaintiffs. And if it had been shown that he went down voluntarily for his own purposes, unconnected with the object of his employment, and in willful disobedience of orders, his being in the pit would still have been an incidental but indirect consequence of the employment in digging at the ore banks, and on the edge of the pit. This apparent assumption of dominion over himself would not have changed the rights and relation of the parties either with respect to Edmund or to each other. And as it would not have relieved the defendants from the duty of ordinary or reasonable care and dilligence, if the employment was rightful, neither if the employment was a violation of their contract, did it relieve them from the responsibilities arising from the wrongful act of misusing the hired property belonging to another. And although

by going into the pit voluntarily, and without any necessity connected with the object of his employment by the defendants, Edmund suspended his own service in the employment in which he was placed by them, it did not thereby terminate either the authority or the will which had placed him in that service, to which there is no reason to doubt that if he had escaped without injury, he would have returned either voluntarily or by compulsion. At any rate this act of Edmund, however willful or desperate, was no withdrawal on their part of the authority and control under which he was employed in digging ore, and as his going into the pit was a consequence of that employment, they cannot, if the employment was a violation of their contract, and a misuse of the hired slave, rely upon his act as purging their own wrong, even if he had, by an instantaneous and willful suicide, terminated at once and absolutely the unauthorized employment.

So far as the defendants have acted, and so far as regards them, if they had no right to employ Edmund as they did, their illegal assumption of authority to do so, and their misuse of the plaintiff's property, continued up to the moment of his death, since if it had not been for that assumption and misuse, which was never withdrawn or changed by them, Edmund would not in all probability have been in the pit when he was, and would not then and there have been killed. It was said by the court of South Carolina, in the case of the railroad company before referred to, (12 *B. Monroe*, 417): "In such a case *it is* in vain to say that the slave was a moral agent, capable of wrong as well as of right *action*, and that he killed himself by jumping off when he ought not," and it is equally vain here to say "that he was the cause of his own death by going into the pit when he ought not." In the case of *Harrison vs. Beckley*, stated in *King vs. Shanks*, 4 *B. Monroe*, 417–18, the court of South Carolina, taking the distinction between those cases in which the damage en-

sues while the wrongful act continues in force and operation, and those in which the damage follows after the act has ceased, says: "Hence it is usually of small moment to enquire whether the damage was the natural consequence of the injury, because the immediate connection between the act and the damage sustained shows that the damage, however extraordinary, has actually resulted from the injury." And in *Story on Bailments, section* 413, &c., it is said in commenting on the case of *Davis vs. Garrett*, above referred to, "for although the tempest might properly in one view be deemed the proximate cause of the loss, yet according to the doctrine of Potheir, the deviation would be the occacasion of the loss; and at the common law the loss would be held sufficiently proximate to the wrongful act of deviation, and to be properly attributable to it, so as to support an action by the shippee."

In the case of *Davis vs. Garrett* the loss might have happened from the same tempest, if there had been no deviation; but there being no proof that it would have so happened, it was for the purposes of the action attributed to the wrongful act of deviation as sufficiently proximate. Here the loss could not have happened by the falling in of the sides of an ore pit except at the ore banks where those pits were. And not only is there no evidence that it would have happened if Edmund had not been employed in digging ore there, but there is a probability amounting almost to certainty that it would not have happened if he had not been employed in digging there, but had been employed in labor at the forge. We say, therefore, that although the loss could not have been foretold as a consequence of that employment, it was in fact the consequence, though not the necessary consequence, of that act, and is logically, as well as technically, attributable to it. And as the defendants, if the employment was unauthorized by the contract, are certainly liable for the damage consequent upon their own illegal act, and incurred du-

ring its continuance, we do not think it necessary to apply to this case the extreme doctrine which is laid down in some of the authorities referred to for determining the relation between the damage and the unlawful act, nor to decide whether that doctrine which has grown up in reference to brutes and inanimate property, is applicable in all its rigor to the case of slaves, who are moral beings as well as subjects of property.

3. If one engaged in a particular business hire a slave to be engaged in that business, without restriction as to the particular branch in which he is to be used, there is no liability for any injury that may result to the slave, unless there has been a want of reasonable care and dilligence by the hirer, such as a man would use in regard to his own property, in protecting him from the dangers incident to the employment.

The fundamental question in the case relates to the fact, whether the contract of hiring was general or contained the restriction contended for by the defendants. If it was general, the defendants had a right to employ Edmund to work in or at the ore banks, using ordinary, that is, reasonable care and diligence to protect him from any dangers incident to that employment, and to rescue him from any danger actually incurred, whether necessarily or unnecessarily. This degree of care and diligence being that which a man of ordinary prudence would, under similar circumstances, use with respect to his own slave, is not susceptible of a more precise definition than to say that it is such as the circumstances seem reasonably to require and admit of, having respect to the nature of the property and the condition in which it is placed. The mere fact that a slave employed at the ore banks might voluntarily go into one of the pits could not be deemed an imminent hazzard, but was such a one as in ordinary prudence might be supposed to be sufficiently guarded against, by mere direction or advice, founded upon the danger of going into the pits; unless, when a slave or slaves being put to work where there was danger of falling in, more stringent orders or directions, or other measures for avoiding or preventing such accidents, should in ordinary prudence be requisite. The facts of this case do not seem to require a more particular statement of this principle.

4. Where there is a general hir-

One of the instructions for the plaintiff, assuming that there was no restriction in the contract of hir-

ing, tells the jury that if the ore bank on which Edmund was put to work was a place of danger, it was the duty of the defendants to keep the strictest watch, and observe extraordinary care and diligence to avoid or prevent any accident or injury to him arising from such dangerous position. And if they failed to do so, and in consequence thereof the slave was killed, they are liable to the plaintiff for the loss. This instruction places the liability of the defendants, under the assumed contract or ground, different from that on which the law places it, and imposes a duty upon them which, according to the principles which we have stated, the circumstances proved did not impose. The mere fact that there was some danger incident to the place of an authorized employment, did not impose the duty of extreme watchfulness, &c., but only the duty of such care and diligence, that is, of such precaution, by advice or otherwise, as a man of ordinary prudence would under the same circumstances use with respect to his own slave. This instruction is therefore erroneous, and in the equivocal state of the evidence it may have affected the verdict.

The instruction which states the duty of the defendant in recalling or rescuing Edmund from the pit, if understood to be based upon the fact of a timely knowledge of his being there, is still subject to the objection that there is no evidence upon which the jury were authorized to find the existence of such timely knowledge. The instruction was therefore misleading, and may have been prejudicial. We think the same objection applies to the instruction which authorizes the jury to find that the loss resulted from the want of ordinary care and diligence on the part of the defendants. It would be mere conjecture to say that Edmund or his shovel fell into the pit from want of due care of the defendants or their agent. There is no evidence sufficient to authorize a verdict founded on such a conjecture, nor to show that any further caution was necessary in placing

*[margin note:]* ing of a slave for a particular employment, no more particular superintendency is due from the hirer than a prudent man would use as to his own slave.

Edmund at work near the pit, than the order or direction not to go into it. These three instructions are based upon the supposition that this employment at or near the ore banks was authorized by the contract. Some of the instructions asked for by the plaintiff and given by the court, upon the hypothesis that the employment was unauthorized, and therefore illegal, base their conclusion in favor of the plaintiff on the belief by the jury that the loss resulted from this illegal employment, which is in accordance with the principles of this opinion. Other instructions also given do not refer the question as to the relation between the loss and the illegal employment or misuse of the slave to the jury as a distinct question of fact for their inquiry, but tell them in substance, that if the contract of hiring contained the prohibition contended for as to working Edmund at the ore banks, and if in violation of it the defendants caused him to work on or at the ore banks, they are liable to the plaintiff for any injury he sustained by reason of any casualty which occurred to the slave during such employment or work at the ore bank; and that his having entered into the dangerous place where he was killed contrary to the superintendent's command, if he did so, furnished no excuse to them, but they are liable because they had him at the forbidden place.

If the principles here asserted were that the mere coexistence in point of time of the unlawful act and the casualty, of whatever sort, which produces the loss, is sufficient to make the defendants, if guilty of the unlawful act, liable for the loss, then, although apparently sustained by common law authorities, it goes farther in terms than we have thought necessary for this case. But even if in so doing, it should be deemed to some extent erroneous, which we do not decide, still, as upon the facts assumed, which include not only time and illegality of employment, but also place, as constituting an essential part of that illegality, the legal conclusion is, that the casu-

alty and loss happening at that place and in that employment are attributable to the illegal act of the defendants, and that they are therefore liable for the loss. This we think has been shown. The instruction then is right so far as it relates to this case, and the error, if any, could not have been prejudicial. In all the cases which we have seen upon the subject, the question whether, upon a certain state of facts, the relation between the illegal act and the damage sustained was sufficiently proximate to create a liability on the part of the wrong doer, and to sustain an action against them for the loss, has been treated as a question of law to be decided by the court, and not as a question to be determined by the jury after determining the facts by which the relation is demonstrated.

It is in this light that we have, in a former part of this opinion, considered the question as it was presented by facts which, except as to the existence or nonexistence of the restriction in the contract, were uncontested and indisputable. And upon the belief of these facts and of the restriction, the court had a right to say that even if Edmund went into the pit in violation of orders from the superintendent, the defendants were liable for his value, and the jury were bound so to find. The court also properly told the jury, that if there was no restriction in the contract, and if in employing Edmund at the ore banks the defendants took reasonable care to avoid dangerous risks, they are not liable for his death, if contrary to the command, and without the consent of their agent, Edmund went into the pit and there lost his life. But this does not correct the error in a former instruction above noticed, which, while it is understood as authorizing the jury to find that the ore bank on which Edmund was put to work was dangerous, tells them that if it was so, the defendants were bound to keep the strictest watch, &c.

The principles which we consider applicable to the case upon either hypothesis as to the terms of the

contract, that it is unnecessary to notice further the instructions given or refused.   We only add, that if Edmund was illegally employed at the ore banks, in violation of the contract of hiring, no question of diligence or negligence can arise.   If on this hypothesis the defendants are not liable for all casualties which might have happened to the injury of Edmund after they commenced and before they ceased their illegal use and control, they are at least liable for such as may reasonably be attributed to their illegal act, though other intervening cause or causes may have cooperated with it.   But as this question as to the restriction in the contract is doubtful upon the evidence, and might have been determined either way by the jury, it is important that the principle of liability on each hypothesis should have been correctly expounded.

Wherefore, the judgment is reversed, and the cause remanded for a new trial according to the principles of this opinion.