Argued October 17, 1929; reversed with modifications
January 14, 1930

# NORTHERN LIFE INSURANCE CO. *v.* THELMA MARIE BURKHOLDER

(283 Pac. 739)

For appellant there was a brief and oral argument by *Mr. Arthur Langguth.*

For respondent there was a brief over the names of *Mr. Richard Sleight, Mr. T. Walter Gillard and Mr. Gus C. Moser* with an oral argument by *Mr. Sleight.*

McBRIDE, J. This case presents some new and perplexing features which differentiate it from most of the cases which are cited in the brief of counsel and the excellent opinion of the learned circuit judge. The facts are practically undisputed. The deceased was betrothed to Miss Thelma Marie Burkholder, the date of the engagement being in December, 1925. On April 15, 1926, the decedent secured a policy on his life in the plaintiff company whereby he was insured for the sum of $3,000 payable to himself on the anniversary of his 65th birthday upon the surrender of the policy, or, upon his death before that date, payable to his estate. In the application, and in his policy, he reserved the right to change the beneficiary, such change to be effected in the manner specified in the policy, which provisions are as follows:

"Change of Beneficiary. The insured, if not otherwise specified herein, and if no assignment has been made, reserves the right to change the beneficiary by obtaining such endorsement on the policy by the president, or secretary of the company, and he may by like method waive such privilege, thereby irrevocably determining the beneficiary."

"Register of Change of Beneficiary.

"Note—No change, designation, or declaration shall take effect until endorsed on this policy by the company at the home office.

"Date endorsed. Beneficiary Endorsed by               ''

It is conceded by all parties that no indorsement of any change on the policy was ever made by the president or secretary, nor was any attempt made by the deceased to procure such indorsement. It is also conceded by both parties that the deceased in his own handwriting wrote the name of Thelma Marie Burk-

holder upon a blank space in the policy left for the name of the beneficiary and immediately preceding the designation of the "estate" of deceased already in the policy. As throwing some light upon the intention of deceased, the following testimony given by Thelma Marie Burkholder may be referred to:

"Q. Do you remember of him taking out a life insurance policy in the Northern Life Insurance company?

"A. Yes, sir.

"Q. Did he ever discuss that with you or talk about it?

"A. Yes, several times.

"Q. Do you know what month or what time he took this policy?

"A. The fifteenth of April, I believe.

"Mr. Sleight: Q. What year?

"A. 1926.

"Mr. Langguth: Q. What conversation, if any, did you have with him or he with you in reference to the beneficiary of this policy, if anything should happen to him? Just tell the court what conversation took place and on what occasions, and so on.

"A. Well, after we were engaged he said he thought that I should be the beneficiary if anything should happen to him.

"Q. You mean after the policy was issued?

"A. After the policy was issued, yes.

＊　　　＊　　　＊　　　＊　　　＊

"Q. Now back to the question of insurance, was that all he said at that time, that he wanted the insurance to be made payable to you?

"A. Made payable to me. He said he thought that I should be entitled to it, because he thought a good deal of me and he thought that I should have it.

＊　　　＊　　　＊　　　＊　　　＊

"Q. Was that what brought up the question of his policy?

"A. He said that he was going to sign my name and he felt that I should have it.

"Q. And did he tell you how he was going to put your name in or make you beneficiary?

"A. He said he seen that there was a place in there and he could put it in there himself and I said I didn't know whether it would be lawful or not, but he said he thought it would, and consequently I think he must have put it there.

"Q. He hadn't put it in there at that time?

"A. No, not at that time.

"Q. But his conversation would indicate that he was going to do it?

"A. Yes.

\* \* \* \* \*

"Q. You saw him only once after the last conversation concerning the writing in of the name on the policy?

"A. That is all.

"Q. And at that conversation he told you he was going to put your name in?

"A. He said he was going to put my name in there.

"Q. And did he give you a reason for it, a reason why he was going to do it?

"A. Yes, we were to be married then shortly after that and he thought I would be entitled to be the beneficiary.

\* \* \* \* \*

"Q. I hand you policy No. M-30241, Northern Life Insurance company, issued to Fred Marti April 15, 1926, and ask you to examine that and observe the handwriting in pencil in the place where the name of the beneficiary is usually put. Is that your name?

"The Court: That is on the front page?

"Mr. Langguth: On the front page of the policy.

"Q. Is that your name?

"A. Yes. that is my name.

"Q. And whose handwriting is that?

"A. Marti's.

"Q. The man that you were engaged to be married to?

"A. Yes, sir.

"Q. I call your attention to an inside page that is numbered two, under page marked 'These Provisions are Applicable Only to Accident and Health Insurance.' The lower part of the page under 'Copy of Application,' paragraph 10, says 'Policy to be payable in case of death under its provisions to;' then comes, 'Name of Beneficiary, T. M. Burkholder, Address, Corbett, Oregon.'

"A. That is Marti's.

"Q. And is that your name that he has written in there?

"A. That is my initials and name.

"Q. Referring back to the front page of the policy, I observe the name is spelled T-e-l-m-a, Telma. How do you think that occurred?

"A. Well, just his way that he used to call me. He used to call me by that name.

"Q. What was his nationality?

"A. He was Swiss.

"Mr. Sleight: We will say, Mr. Langguth, if you want to, to save time, we will concede that that meant her.

"Mr. Langguth: I want it in the record, is all.

"Q. That was the way he pronounced your first name?

"A. Yes.

"Q. In his pronunciation of words commencing with 'th' did he usually drop the correct pronunciation and adopt the plain 't' similar to German?

"A. Yes.

"Q. So that he called you 'Telma' instead of 'Thelma'?

"A. Yes, sir.

"Mr. Langguth: I offer this in evidence.

"Q. Thelma, you are claiming this insurance fund under this policy by virtue of his telling you that he wanted you to be the beneficiary, and his act in writing your name in the policy?

"A. I do."

Thelma, on cross-examination, testified that she had no knowledge of the fact that her name had been

written into the policy until after the death of Marti, and that she had never had possession of the policy. That she had an insurable interest in the life of decedent Marti is well settled by the authorities. The existence of an engagement of marriage between Thelma and the deceased was certainly a good consideration to support her designation as a beneficiary, and, as the Missouri case cited below seems to indicate, perhaps a valuable consideration. 37 C. J. 395, § 61cc; *Chisholm v. National Capital Life Ins. Co.*, 52 Mo. 213. So we have here a case where the new beneficiary is competent to take, where the insured wishes to invest her with the right to receive the proceeds of the policy, and where he ignorantly attempts to carry out that intent in a manner different from that presented in the policy. Now in an equity proceeding, where so far as Thelma is concerned, the object is to require the carrying out of the actual conceded intent of the insured, who has the right to object? When the change or attempted change was made Marti's "estate" was in effect himself. There was no administrator in existence and no actual beneficiary in existence whose consent was required. The contract at the time was a two-party contract, the insurer and the insured. He could forfeit the policy for nonpayment and there was no "beneficiary" who could step in and keep up the payments or claim the right to a paid-up policy equal to the amount of premiums paid. So, between him and his estate there was no distinction. What he did, his "estate" through him consented to, and what he did, bound his administrator. This view is supported by the authorities. The *Prudential Insurance Co. v. Deyerberg,* 101, N. J. Eq. 90; *Gaines & Co. v. Gaines,* 30 Ky. Law, 710 (99 S. W. 600) ; *Metropolitan Life Ins. Co. v. Fidelity Nat. Bank & Trust Co.,* 206 Mo. App. 676 (229 S. W. 399).

A distinction is to be drawn between the usual old line policies of insurance, such as the plaintiff has here, and so-called policies issued by certain mutual benefit societies. As a rule, in the former the insured is, as here, the owner of the policy. In the benefit certificates issued by many of the latter associations, it has been held that, under the rules of many such associations, the insured is not the absolute owner of the policy, but has a mere power of appointment, and that such power can not be exercised except in the manner designated by the rules of the association. While this rule is not the invariable one, but depends largely upon the rules and bylaws of the particular association, it is sufficiently constant to account for many of the decisions holding for a strict compliance with the rules of the association in changing a beneficiary. The reason for this distinction is made apparent in *Faubel v. Eckhart,* 151 Wis. 155, which cites other cases to the same effect. We are of the opinion that the administrator, who merely steps in the shoes of the deceased, is not in a position to urge the fact that deceased did not exercise his right of selecting a beneficiary, or in transferring the policy regularly, unless the insurer has objected to the transfer of the designation. The insurer has made no such objection. It has brought the money into court, stated the facts, which are not denied by the administrator, and declares itself entirely willing that the court shall adjudge the fund to whomsoever it deems legally entitled thereto.

It has been held by this court in *Rhodes v. Equitable L. Assurance Society of U. S.,* 109 Or. 586 (220 P. 736), that an insurer waives any right it may have as to a procedure in designating a beneficiary by paying the money into court, citing with approval *Woodmen of the World v. Rutledge,* 133 Cal. 640 (65 P. 1105) ; *Titsworth*

*v. Titsworth,* 40 Kan. 571 (20 P. 213) ; *Hall v. Allen,* 75 Miss. 205; 22 So. 4; and, until we conclude that our opinion is so contrary to reason and authority that it should be overruled, it governs that phase of this case. We are not so satisfied. On the contrary, we are of the opinion · that authority supports the doctrine announced in that opinion. We do not say that a mere count of opinions may predominate in favor of the rule as contended for by appellant because there are some authorities holding to the contrary, but, taking into consideration the reasoning of the opinion, we are satisfied with the holding in *Rhodes v. Equitable L. Assurance Society of U. S.,* supra, so far as it applies to cases like the present. Supporting that rule to a greater or less extent are the following cases cited by counsel for appellant: *Opitz v. Karel,* 118 Wis. 527; *Wentworth v. E. L. A. Society,* 65 Utah 581; *Manning v. A. O. U. W.,* 56 Ky. 136, 139 ; *Hall v. Allen,* 75 Miss. 175; *Pleasants v. Locomotive Engrs., etc., Ass'n.,* 70 W. Va. 389; II Joyce, Insurance, § 734; *Slawn v. Chew,* 60 Tex. 532; *John Hancock Mut. Life Ins. Co., Admr., et al. v. White,* 20 R. I. 457; 4 Cooley's Brief on Insurance, 3772; *Nally v. Nally,* 74 Ga. 669; *Atkinson v. Metropolitan Life Ins. Co.,* 114 Ohio St. 109; *White v. White,* 194 N. Y. S. 117; *Frakes v. Brotherhood of Locomotive Firemen,* — Mo. — (204 S. W. 26).

Not only by the mere fact of bringing the money into court has the company waived the requirements of its policy in regard to consent, et cetera, but it has used language in the complaint indicating an intent to expressly waive these requirements.

In addition to the language already quoted in the statement, the complaint contains the following:

"That as between said defendants this plaintiff is wholly neutral and there is no collusion between this plaintiff and either or any of the defendants, and this

plaintiff with this, its complaint, pays into this court the sum now due on said policy, to wit: the sum of two thousand nine hundred and 95/100 dollars ($2,-900.95), the same to be held by this court and paid in accordance with the final determination of this cause."

So we have here a clear and unmistakable designation under the hand of the decedent, that he wished Thelma to receive the proceeds of his insurance policy, supplemented by the testimony of Thelma as to the declared intention of the decedent, that he intended to make her the beneficiary, and to "make over" the policy to her, the reason for such action being that she was shortly to become his wife, the last declaration to that effect being some four or five days before his death. Whether after leaving her on that Wednesday night he sat down with his heart full of tender recollections of that last interview and then and there wrote her name as beneficiary into the policy, or whether he made the change on the day of his death, or within the intervening four days, we do not know; but at any rate we have traced that intention pretty close to the portals of his grave, so close, indeed, that it is not denied by the administrator that he intended and "attempted," in the language of the complaint, to make her the beneficiary, making that attempt in the manner in which he told Thelma he would make it, and in which mode she tacitly acquiesced. It is true that he did not follow the technical method prescribed by the policy, but this method was for the benefit or convenience of the company, and so far as this old line insurance company was concerned, the indorsement upon the policy by the president or secretary would have been a purely ministerial act which they could not legally have refused, and which requirement the company waived as heretofore shown.

As to the estate of decedent, it was to all intents existent in the decedent himself when he named Thelma as the beneficiary, and after his death his administrator had no right to dispute his designation. The claim of the administrator is not on behalf of the heirs or the relatives of deceased but on behalf of the estate, and such a claim, if allowed, would be far reaching and inequitable in its consequences. Suppose that in this case, or in any future case, there should have been no living relatives, and the administrator should set up the same defense that he makes here, and that in deference to some sawdust stuffed precedent it should be allowed. We would then have a case where a dearly-loved betrothed girl, who had given love for love, had delayed the funeral of her fiance for 10 days hoping to find some relative of deceased, who had from her own slender purse defrayed the expense of a respectable funeral for his remains and to whom it was his last written intent that the proceeds of his policy should pass, and that intent should be set aside and contrary to his proved and expressed wish, the fund should go to his administrator, and in default of heirs be escheated to the state. Such a construction would shock the conscience of Radamanthus himself, much more the sensibilities of a twentieth century court of equity, and yet to give this fund to the administrator in this case would be to create just such a precedent as in the case above supposed, since, as we have before remarked, the fact that there are heirs, or supposed heirs, is a mere incident in this case, and not legally of importance one way or the other.

The learned judge, who decided this case in the court below, and whose opinion, in most respects is a model of legal research, made, we think, the one mistake of applying to the first designation, namely, "to

my estate'' the same rule that is so often and generally applied where the designation of a beneficiary is to a particular person and often to a person financially interested. He expressed, and no doubt felt, great reluctance in feeling bound to turn this fund over to the administrator.

Taking a different view of the law in the respects mentioned, we hold that the equities here are with Thelma Marie Burkholder, and that she is entitled to the fund, but as the matter was debatable, and the administrator was compelled to defend for his own protection, he should be allowed compensation from the fund for his attorney's fees in the sum of $250, and the allowances to the plaintiff, as made in the court below, should stand, and neither party will otherwise recover costs and disbursements in this court or the court below.

REVERSED WITH MODIFICATIONS.

BROWN and BELT, JJ., absent.

RAND, J., dissents.