### MARY J. HALL ET AL. *v.* EMMA ALLEN ET AL.

MUTUAL INSURANCE.    *Benefit certificate.  Laws of the society.  Rival claimants.*

    The laws of a mutual benefit insurance company, prescribing rules for changes of payees in benefit certificates, are intended alone for the protection of the society, and, when waived by the society, confer no rights on rival claimants. The mode of changing the beneficiaries prescribed by such rules, as between rival claimants, is not exclusive.

FROM the chancery court of Warren county.

HON. CLAUDE PINTARD, Chancellor.

The facts appear in the briefs of counsel, which are published in full by order of the court.

*Dabney & McCabe*, for the appellants.

*Statement of the case.*—George M. Seay, who was an employe of the Yazoo & Mississippi Valley Railroad Company, with headquarters at Memphis, Tennessee, but whose residence was in Bartow county, Georgia, was, on the first of January, 1895, a member of the Hill City Lodge No. 460, of the Brotherhood of Locomotive Firemen, located at Vicksburg, Mississippi. He had taken out a policy of insurance on his life in the order, in the form prescribed by its constitution, for $1,500, which was payable at his death to his mother, Mrs. Nancy Jane Seay. On the third day of August, 1895, his mother died at her home near Linwood, Georgia. At the time of her death, she was still the beneficiary in the policy. It will not be disputed, we apprehend, that, upon the death of the mother, the policy reverted to George M. Seay, and that upon his death, without an assignment of this policy, it would be payable to his personal representative. About the tenth of August, 1895, George M. Seay was informed by letter of the death of his mother. He was sick himself at this time, but not dangerously so. On Tuesday night, August 15, he was taken worse, and on Wednesday morning, the sixteenth, he expressed a desire, for the first time, to have his policy made payable to his sister, Emma Allen, the appellee herein. One of the appellee's witnesses, Lee Porter, says that Seay wanted him to go to Vicksburg and have the change made right away, while two of her other witnesses, Henry Brannon, a friend of his, and Jack Jordan, a little boy, who waited on him while he was sick, say that up to Friday night, August 17, at seven o'clock, he was expressing a hope that he would be able to go to Vicksburg the next evening, which was Saturday, where he would have better care and attention than he was having in Memphis, and would attend to the matter himself.

At any rate, the witness, Lee Porter, did not leave for Vicksburg until Saturday, August 18, at about nine o'clock

A.M., for the purpose of having the policy changed.   Prior to
Porter's departure, George M. Seay, fearing that Porter might
forget the name of the new beneficiary, wrote her name in Lee
Porter's note book, and instructed him to have her substituted
as beneficiary.   Although it is clearly shown that he could
write, he did not attempt to make any will in her favor; nor
did he attempt to make a written assignment of this fund to
her; nor did he write any letter or directions of any kind to
the order requesting the change.   In short, he did no act him-
self which was intended as a change of the beneficiary, or
which he thought amounted to a change of such beneficiary.
To state the matter differently, he did not himself try to make
any change of the beneficiary, or to make any assignment of
the fund to her.   What he did and all he did, was to instruct
the witness, Porter, to come to Vicksburg and have the change
made for him.   He doubtless thought that the only way in
which the proposed change could be made was in the manner
provided for by the constitution of the brotherhood.

Porter left Memphis at 9 A.M. on August 18, and arrived
at Vicksburg at 7:30 that night.   His instructions, in his own
language, were as follows: " He gave me directions to have it
changed; gave me her address and told me he wanted it made
to his sister, Mrs. Emma Allen, and that she was to have all
over and above his expenses and indebtedness.   He wanted me
to pay all his indebtedness."

What effort he made on arriving at Vicksburg to have the
policy changed is best stated in his own language: " I went
around to see how many members I could find, and also went
to the lodge room, but found no one there; there was not enough
members to hold a meeting.   The secretary had the keys to the
lodge room and I could not get in there."

And this is all that he did; all the effort that he made to have
the policy changed.   No attempt was made to find the secretary
or president of the lodge other than a visit to the lodge room.
No notice, verbal or written, was given to the secretary or the

president of the desired change. No effort was made to assign the policy in writing to Mrs. Emma Allen, and yet it does not appear from the evidence that any of these things were impossible on his part. It does not appear that the secretary and the president were both out of town; it does not appear that there was no one in Vicksburg representing the lodge who could properly receive the notice. For aught that appears from the record and from the testimony of this witness, the secretary and the president of the lodge might either, or both, have been found by twenty minutes search, and that written notice of the desired change might have been lodged with them within twenty minutes after his arrival in Vicksburg, and all the probabilities are that that could have been done.

Lee Porter did not think that his friend was seriously ill; in fact, he had heard the doctor tell him so only a few days before. He knew he was up and around about in his room, and this is doubtless the reason that he made no more diligent effort to have the policy changed on the night of his arrival in Vicksburg. The next morning, however, he received a telegram to the effect that George M. Seay had died at 11:55 the night on which Porter arrived here. Porter, believing his mission ended, immediately went back to Memphis without doing anything further in the matter.

Shortly after the death of George M. Seay, the defendant, A. M. Foute, was appointed as administrator of the estate of Nancy Jane Seay, and of the said George M. Seay also, by the proper court of Bartow county, Georgia, where both said decedents resided, and qualified as such administrator.

On December 30, 1895, Mrs. Emma Allen, the appellee, brought this suit against the Brotherhood of Locomotive Firemen and against A. M. Foute as administrator of the estates of both of said decedents, and against the other defendants, who were heirs at law of both said decedents, claiming that after the death of Mrs. Nancy Jane Seay, her brother had made over, transferred, and assigned the policy to her, individually, and

that she was entitled to the whole of the fund. After suit was brought, by agreement of all parties, the brotherhood paid the amount of the benefit certificate, less the funeral expenses of George M. Seay, amounting to $295, to the People's Savings Bank & Loan Co., which, by virtue of said agreement, was to all intents and purposes substituted in lieu of the Brotherhood of Locomotive Firemen, and the suit, in so far as the latter was concerned, was dismissed, and the court left to dispose of the fund as between the rival claimants thereto above named, in accordance with the law.

A. W. Foute, as administrator of the estates of both of said decedents, and the other appellants as heirs at law of Nancy Jane Seay and George M. Seay, answered the bill denying all of the material allegations thereof, and claiming that they were entitled to the fund. Depositions were taken on both sides, and upon a final hearing of the cause, the court below decreed in favor of the appellee, Emma Allen, and adjudged the fund to her and gave judgment in her favor against the People's Savings Bank & Loan Company of Vicksburg for the amount, with interest at the rate of four per cent. per annum, in accordance with the agreement filed with the papers, whereby it became the custodian of the fund and a party to this suit.

Thereupon the defendants, Foute and others, appealed to this court, and assign for error the action of the court below in decreeing in favor of the appellee, Emma Allen, and in adjudging said fund to her; in rendering judgment in her favor against the People's Savings Bank & Loan Company for said sum; in not decreeing in favor of the appellants for said fund as against the appellee, Emma Allen; and in not rendering a judgment in favor of appellants, or some one of them, against the People's Savings Bank & Loan Company, for said fund.

Inasmuch as the heirs of Nancy Jane Seay and those of George M. Seay are identical, and the result will be the same to them whether they inherit from the one or the other, it can make no difference to the appellants whether the court gives

the fund to A. M. Foute as administrator of the estate of the mother, or to him as administrator of the estate of the son.

We think, however, that, upon the death of the mother, the benefit certificate reverted to the son, and that, upon his death, if the certificate had not been assigned, his administrator would take, and not hers, and we ask the court to so decree. Nor can it make any difference to the complainant, if she is not entitled to the fund individually, which of the ways named above the court disposes of it, since she is also an heir both of the mother and of the son, and, as such, entitled to share in the distribution of their respective estates like the appellants, excluding, of course, the administrator. It follows, therefore, that there is but one question for discussion and decision, and that is, did George M. Seay, after his mother's death on August 3, 1895, and before his own death on eighteenth day of the same month, transfer or assign his benefit certificate to the complainant, Emma Allen, so as to vest in her individually the right to this fund.

Before proceeding, however, to an argument of this question, we call the court's attention to certain evidence taken on behalf of the appellee in this case. One of the reasons given by George Seay, as stated by the witness, Lee Porter, for wanting his sister, Emma Allen, to have this policy, was that she had taken care of his mother during the last year or so of her life, and a great mass of evidence was taken by the appellee to prove the truth of this fact. Inasmuch as the question to be determined is one of transfer or no transfer, we fail to see how this evidence can have any effect whatever on the issues to be tried or why it was introduced, unless it be for its moral effect. If that is the object or purpose of the evidence, we think it can be safely asserted that the appellants have met such purpose with equally satisfactory evidence to the effect that Mrs. Allen did not take care of her mother during the last year of the latter's life, but that, on the contrary, she and her husband were the beneficiaries of her mother's bounty during that time.

It will be seen, by an examination of the agreement under which this evidence is taken, that exceptions to its competency and relevancy were reserved. It is clear to our minds that the evidence is incompetent and irrelevant, and inadmissible for any purpose whatever, and we dismiss it from further consideration, and proceed now to an argument of the real question at issue.

*Argument.*—Mrs. Nancy Jane Seay, the beneficiary named in the policy, having died on August 3, 1895, and the policy having, in consequence of her death, reverted to George M. Seay, and standing in his name in legal contemplation at the time of his death, the burden is upon the appellee, Emma Allen, to show a transfer or assignment of the policy to her before she will be entitled to a decree in her favor at the hands of this court. The first question, therefore, which suggests itself to the legal mind is, how transfers or assignments of policies of this character are to be made. Some of the courts hold that such a policy may be devised by a will; others that it may be transferred by a written assignment, but the general and, we may say, prevailing rule, as shown by all the decisions, is that when the laws of a benefit society prescribe the mode of changing the beneficiary, the mode prescribed must be followed, and no change can be made in any other manner. *McLaughlin* v. *McLaughlin*, 43 Am. St. Rep., 83; Niblack on Mut. Benefit Societies, sec. 221; Bacon on Benefit Societies, sec. 307; *Wendt* v. *Ia. Legion of Honor*, 72 Ia., 682; *Supreme Conclave Royal Adelphia* v. *Cupella*, 41 Fed. Rep., 1; *National Mut. Aid Society* v. *Lupold*, 101 Pa. St., 111; *Gentry* v. *Sup. Lodge K. of H.*, 23 Fed. Rep., 718; *Ireland* v. *Ireland*, 42 Hun, 212; *Sup. Lodge K. of H.* v. *Nairn*, 60 Mich., 44; *Vollman's Appeal*, 92 Pa., 50; *Elliott* v. *Whedbee*, 94 N. C., 115; *Highland* v. *Highland*, 109 Ill., 366; *Greeno* v. *Greeno*, 23 Hun, 478; *Masonic Mut. L. Ins. Co.* v. *Miller*, 13 Bush, 489; *Manning* v. *Sup. Lodge A. O. U. W.*, 86 Ky., 136; *Olmstead* v. *Masonic Mut. Ben. So.*, 37 Kan., 93; *Busye* v. *Adams*, 81

. Ky., 368; *Daniel* v. *Pratt*, 144 Mass., 216; *Harmon* v. *Lewis*, 24 Fed. Rep., 97, 530; *Hotel Men's Mut. Ben. Asso.* v. *Brown*, 33 Fed. Rep., 11.

But we have already seen that no attempt was made by George M. Seay to will this policy to his sister, Emma Allen; nor was any attempt made to assign it to her in writing; nor any attempt to transfer it to her in any other manner than that provided by the constitution of the brotherhood, and for that reason, whether there was a transfer of this policy by George M. Seay to the appellee must be determined by the constitution of the brotherhood.

Section 66 of the constitution, a copy of which will be found attached to the record as a part thereof, provides as follows:

"*Benefit certificates, how transferred.*—Sec. 66. Any member desiring to make a new direction as to the payment of his benefit certificate, may do so by and with the consent of the lodge of which he is a member. He shall then authorize or make such change in writing on the back of the certificate in the form prescribed, attested by the secretary, with the seal of the lodge attached; but no such change or transfer shall be valid or have any binding effect until reported to the grand secretary and treasurer. . . . All transfers of beneficiary certificates shall be recorded in the beneficiary certificate register of the subordinate lodge, and also in the grand register."

In order, therefore, to show a valid transfer of this policy to her, the appellee, Emma Allen, must show, first, that George M. Seay, or some one acting for him, obtained the consent of the Hill City Lodge, of which he was a member, to the transfer; secondly, that he then made, or authorized some one to make for him, such change, in writing, upon the back of the certificate in the form prescribed; thirdly, that this change was attested by the secretary, with the seal of the lodge attached; fourthly, that such change or transfer was reported to the grand secretary and treasurer; fifthly, that the transfer of the benefit certificate was recorded in the beneficiary cer-

tificate register of the subordinate lodge, and also in the grand lodge.

From a review of the evidence already fully stated, it will be seen that not a single one of these requirements of the constitution, providing for a transfer, have been complied with. It is true, that, after the death of George M. Seay, the secretary of the Hill City Lodge No. 460 filled up the blank transfer on the back of the certificate, preparatory to its execution, and entered a transfer of the same on the benefit register of the subordinate lodge. If these acts of the secretary had been done by the authority of George M. Seay, or by some one acting for him, they would not have been, in themselves, sufficient to effect the transfer of the policy, for the reasons that no application, verbal or written, was ever made to the subordinate lodge for such transfer; the consent of said lodge to the transfer is not shown, and was never in fact obtained; and the transfer on the back of the certificate was never executed. But it is admitted that the filling in of the blank and the entry on the benefit register made by the secretary, were done without authority from George M. Seay and without authority from anyone acting for him, and was done by the secretary of his own volition, long after the death of George M. Seay, and simply because he had heard in some way that Seay wanted his certificate so changed. And it follows that such acts are without consequence in determining this suit. In fact, it is not pretended by the appellee that any of the provisions of the constitution were complied with; but it is claimed that there was a transfer of the policy notwithstanding such noncompliance.

It is first contended that these several requirements of the constitution were designed and intended for the benefit and protection of the Brotherhood of Locomotive Firemen itself; that it had a right to waive these, and that it did waive them by paying the money into court, and from this it is argued that the appellee acquired some sort of advantage over the appellants by virtue of such waiver and payment.

This, however, is an erroneous view of the law.   It is true
that the payment of the money into court was a waiver in so
far as the brotherhood was concerned, but to that extent only,
and it was thereby estopped from claiming the fund.   But the
brotherhood could not, and did not, by paying the money into
court, add to or detract from the rights of either of the rival
claimants to that fund.

In *Wendt* v. *Iowa Legion of Honor*, and in *McLaughlin* v.
*McLaughlin, supra,* and in *Keener* v. *Grand Lodge A. O. U. W.*,
38 Mo. App., 533, and in a number of the other cases, cited
above, the money was paid into court, and the effect of such pay-
ment was expressly adjudicated in those cases.   The language of
the decision in *Wendt* v. *Iowa Legion of Honor*, will be seen at
page 88 of the 43 Am. St. Rep.   This decision was approved in
*McLaughlin* v. *McLaughlin*, *Ib.*   In the Missouri case it was
held that where a society brings a fund into court it does not
thereby confess the right of either party to the money, and it
is the duty of the court to see that the money is paid out as
directed or required by the rules and regulations of the order,
and to determine who is the proper person to receive it.

In *McLaughlin* v. *McLaughlin, supra,* the court said that
the council did not, by paying the money into court, waive the
compliance with its laws.   The whole effect, therefore, of the
payment of the money into court by the brotherhood was to
waive its right thereto.   It did not waive its consent to a change
of the beneficiary, nor did it, directly or indirectly, thereby give
its consent that the appellee should have this fund as against the
appellants, and this court must dispose of this fund as between
the rival claimants thereto, just as if no such payment into
court had ever been made.

It is next contended that the insured, George M. Seay, pur-
sued the course pointed out by the constitution of the brother-
hood, and did all things in his power to change the beneficiary,
but, before the consent of the lodge was obtained and the change
actually made, he died, and that a court of equity will, under

the circumstances, treat such change as having been made, upon the doctrine of an equitable assignment.

We concede that the doctrine of an equitable assignment has found favor with some of the courts of last resort. The doctrine has been treated as an exception to the general rule laid down in the authorities cited above, and has only been applied in very extreme cases and where gross wrong and injustice would otherwise have been done. But the answer to this contention is that the insured did not do all he was called upon to do to perfect the transfer, and that, for that reason, this so-called equitable assignment was imperfect and incomplete, as we will now proceed to show.

Just what it takes to make out an equitable assignment is sometimes difficult to determine. There seems to be some confusion, as well as conflict, in the decisions on this subject; but there ought to be a rule by which to determine in each case whether an equitable assignment is complete or not. If there is no such rule, then each chancellor must determine according to his own ideas of what is equity and justice in a given case. This would be a reflection upon our equity jurisprudence. There is a line of demarkation between the complete and incomplete transfer. The question is, where is that line?

It is certain that a mere desire or intention, on the part of the person insured, to transfer his policy, is not sufficient to create an equitable assignment. In *Wendt* v. *Ia. L. of H.*, *supra*, it is said that "expressed intentions or oral declarations of the purpose to change the beneficiary in the policy is not sufficient to effect a change." In other words, some act must be done intended to operate as a change, before it will be complete. Nor is it sufficient that the insured has done all that he could do, or all that it is in his power to do, at the time. To illustrate: If the friend of the deceased had started from Memphis to Vicksburg in time to make the trip and transfer before his death, and the cars had run off the track and delayed him until after the death of the insured, it might truly be said that

he had done all that he could do, all that it was in his power to do, and yet no one would say that in that case an equitable assignment had been effected. Other illustrations will suggest themselves to the court in proof of the proposition stated.

The true rule is this: The deceased, having undertaken to transfer his policy in accordance with the constitution of the brotherhood, was required by law to do all the things and perform all the acts that were required of him by the rules and regulations of the brotherhood. In short, he must leave absolutely nothing to be done so far as he is concerned, and must push his case to where it becomes the duty of some one else to act in the premises.

We have already seen that under the rules and regulations of the brotherhood, to effect an assignment, the consent of the society to the change of beneficiary must be obtained; the transfer must then be made on the back of the policy, and executed in the form there prescribed; the transfer must be attested by the secretary, with the seal of the lodge attached; it must then be entered on the benefit register, and notice of the transfer must be made to the supreme lodge and the transfer entered on its benefit register. Of these things that are to be done to effect the change in the beneficiary some are to be done by the insured and others by the brotherhood or its officers. Among those to be performed by the insured are the following: He must have applied for the consent of the subordinate lodge; he must have filled up the blank transfer on the back of the certificate, and executed the same; and had the execution of the transfer attested by the secretary, with the seal of the lodge attached. In other words, it is made his duty to bring to the knowledge of the lodge, in some formal and definite manner, his desire to have his policy changed, with the name of the new beneficiary, and ask for its consent to the change; to fill up the blank transfer on the back of the certificate, and sign and execute that in accordance with the constitution of the brotherhood; and see that the execution has been properly made and formally

attested.   He cannot compel the lodge to consent to the transfer,
and we do not contend that in order to effect an equitable as-
signment, under the authorities, he would be bound to obtain
such consent for that reason; but we do insist that he could
make a proper application for such change, and that he is re-
quired to do so, both by the law and the constitution of the
brotherhood, and that until he has made such application the
order is not called upon to act, and until it is called upon to act
it cannot be said to be in default for not doing so.

Looking now to the facts of the case, we find that the insured
did not, prior to his death, make any application to the lodge,
either in person or by agent, for a change of his policy from
his mother to his sister.   The lodge was never asked, verbally
or in writing, to consent to any such change, and how can it be
said that the lodge was in default in not entering such consent
upon its records when it was never asked to do so?

But it is contended by appellee that if the lodge had met the
night Lee Porter reached Vicksburg (which was the usual night
for meeting), the formal consent to the change would have been
obtained; that the certificate would have been transferred by
Porter, and the assignment effected, and that it was the fault
of the lodge, in not meeting that night, that the assignment was
not perfected.

The failure of the lodge to meet on the night of August 18
cannot affect the result in this case.   All that can be said of
such a failure is that it prevented Seay's friend, Porter, from
making the application for the change to the lodge in open ses-
sion.   While this might have been one way of making the ap-
plication, it is certainly not the only way; nor is it the way
contemplated by the rules and regulations of the society; nor
is it the way in which such applications are usually made.

The lodge only meets every two weeks, and then remains in
session, possibly, only an hour or so.   It is not always possi-
ble, nor convenient, for a member to be present, either in per-
son or by agent, at such meetings.   Suppose, between these

meetings, a member should become seriously ill or be danger-
ously injured, the law certainly would not require of him to
wait until the lodge met to make his application for a change
of his beneficiary certificate.    He might die in the meantime.
To hold that the application must be made to the order in open
meeting, is tantamount, in many cases, to holding that it can-
not be made at all.

Again, let us suppose that the lodge at Vicksburg had met
the night before Porter arrived here, and would not meet again
in due course for two weeks.    No one would contend that the
insured was barred from making the application, or that his
application, if he had made one in due form to the proper au-
thorities, was out of time, and was bad because not preferred
to the lodge in open session.

The procedure contemplated by the rules and regulations of
the order, and recognized by the decisions of the different
courts, and the one usually followed by members under such
circumstances, is to prepare a written application for the
change, giving the name of the new beneficiary and asking the
consent of the lodge to the change, and filing such application
with the secretary of the lodge.    In some instances the blank
transfer on the back of the certificate is filled up and executed,
and the certificate thus transferred handed to the secretary of
the lodge, with the request that the consent to the transfer be
entered upon the minutes of the lodge.    We notice that in some
cases the application has been filed with the president of the
society, and it might be also that the treasurer would be au-
thorized to receive such an application.

When such application has been formally made so as to leave
no doubt of the intention of the insured, and lodged with the
proper officer, and the blank transfer properly filled up and
executed, provided such application is so lodged and transfer
made before the death of the applicant, then it may be truly
said that the applicant has done all that he is required to do by
the rules and regulations of the society, and it then remains for

the society to take action whenever that body convenes.  Where the insured has filed his application in proper form and with the proper officers, and made the proper transfer, prior to his death, it is possible that the society may act on it after his death and grant the necessary consent, and that such action and such consent on their part will be valid, and the equitable assignment completed.  But no question of that sort is raised in this case, because it is not pretended that the lodge did give its consent to the proposed transfer after the death of George M. Seay.

But whatever the law may be as to what the lodge may do after the death of the applicant, one thing is certain, and that is, unless this application is brought to the knowledge of the lodge, or its proper officers, in some formal and definite shape, and the transfer duly made and attested prior to the death of insured applicant, the assignment is imperfect and incomplete, and all the authorities so hold.  Such was the case here.  No notice of a desire on the part of Geo. M. Seay, to have his policy changed from his mother to his sister, was brought to the knowledge of the lodge prior to his death, and he died without the lodge ever knowing, officially or otherwise, that he even contemplated such a change, and how it can be said, under such circumstances, that an equitable assignment was perfected and completed, we are at a loss to appreciate.  Nor does it appear, if such would be an answer to our position, that this application might not easily and readily have been made.  We repeat that it is not shown that the secretary and the president were not in town; it is not shown that they might not have been found in a few minutes search; it is not shown that there was no other officer of the lodge in Vicksburg who was authorized to receive such application; it is not shown that any such application was prepared and ready for delivery, and that there was no officer or person authorized to receive the same on behalf of said lodge, by which it might have been brought officially to its notice or knowledge.  Nor was the transfer blank

·on the back of the certificate filled in and executed, which was one of the acts to be performed by the insured in order to perfect the assignment.

It is urged, however, by counsel for the appellee, that, according to the testimony of Lee Porter, this certificate was in the lodge room at Vicksburg, in the desk of the secretary, and that it could not be had that night, and, in consequence of that fact, it could not be transferred; that the certificate had only been in the lodge room about three weeks, and that Seay had had no opportunity to get it. The fact is, that this certificate had been in the lodge room, as shown by the certificate itself, from the twelfth day of January, 1895, up to the time of Seay's death. On that date it was signed and countersigned by the president and secretary of the lodge, which will be proven by reference to the certificate itself.

But aside from this view of the case, if George M. Seay had started earlier, he could easily have gotten his certificate in time to have made the transfer. He received the news of his mother's death about the tenth of August. He died on the eighteenth. Here were eight days between the date of his mother's death and of his own. He might easily have written to Vicksburg for it, or have come after it, or have sent for it. If he chose to put off the execution of this transfer until the last minute, and his doing so results in his failure to obtain the policy, and transfer it, as required by the constitution of the order, that was his misfortune. In other words, if it is contended that he had not time to make this transfer from the time his friend started from Memphis to Vicksburg, then we say that he should have started earlier, and, not having done so, he has not done what the constitution required of him. In short, he should have set out to make this transfer in time to have made it in accordance with the rules and regulations. of the order.

In our opinion, this case falls clearly in the category of incomplete transfers, the subject of which is discussed in section

309 of Bacon on Benefit Societies & Life Insurance.　As there said, it often becomes important to know when an attempted change of a beneficiary becomes complete.　Several illustrations are furnished of attempted but incomplete transfers. Among those cited as illustrative of an incomplete transfer, are *Ireland* v. *Ireland*, 42 Hun, 212; *Gladding* v. *Gladding*, 29 N. Y. S. R., 485; *McLaughlin* v. *McLaughlin*, 43 Am. St. Rep., 83.

In the case of *Ireland* v. *Ireland*, a member requested a friend to take his certificate to the secretary of the lodge and have him attest and complete the change, but before this was done, and before the new certificate was delivered to the secretary, the member died.　It was held that the change was incomplete, and the old beneficiary recovered.

In *Gladding* v. *Gladding*, *supra*, a member executed a paper asking the association to pay the amount of the benefit to another person, but the paper was never brought to the notice of the lodge until after the death of the member.　The change was held not to have been effected.

*McLaughlin* v. *McLaughlin*, 104 Cal., 171, so frequently referred to above, is another illustration of an incomplete transfer.　The facts in that case make it far stronger than this, but as the court will probably read that case for itself, we need not quote from it.　It is sufficient to say that in that case a member not only instructed the change, but was told that it had been made, and died believing it.

We respectfully submit that the decree of the court below, awarding the fund in controversy to the appellee, Emma Allen, as against the appellants, and decreeing that she should have and recover the amount, with interest, of and from the Peoples' Savings Bank & Loan Company, shall be reversed and set aside; and that this court will enter a decree in favor of the appellant, A. M. Foute, administrator of the estate of George M. Seay, deceased, awarding the fund to him as against the appellee, Emma Allen, and decreeing that he may have and

recover of and from the Peoples' Savings Bank & Loan Company the fund involved in this suit, with interest thereon, as shown by its agreement on file.

*Shelton & Brunini,* for appellees.

Without going into a detailed statement of the facts, we will quote them by reference to the record as they become applicable to the different points that we propose to insist upon in this argument.

First, the Brotherhood of Locomotive Firemen seems to be a voluntary association, the object of which is to provide protection for members and their families against the perils of their vocation. The association is operated according to the provisions of its constitution.

Section 49 gives the form of the application, in which the member binds himself to comply with all the laws, etc., then in force, or to be enacted, and names the party to whom the benefit is to be paid at his death.

Section 50 gives the form of the certificate. This certificate describes the applicant, then declares him entitled to all the privileges, etc., of membership, and to participate in the beneficiary department to the amount insured for, to be paid to the member, in case of total disability, or to the person named in the application, in case of death. This certificate is to be signed by the officers of the grand lodge. Then it is sent to the subordinate lodge of which the applicant is a member, and there signed by the officers of the subordinate lodge, and by them is to be delivered to the member.

Section 51 provides that on the death of a member the sum insured shall be paid to the person named as beneficiary in the certificate issued from the grand lodge.

Section 60, after providing for the proofs of death, says that with these proofs the secretary of the subordinate lodge shall send the member's certificate to the grand secretary and treasurer, and shall thereupon adjust the claim, if it be found to be just.

Section 66 provides that the member may make a change in the beneficiary with the consent of the subordinate lodge of which he is a member; there is then a provision as to the mode of making the change—that is, he shall make the change in writing on the back of the certificate, in the form prescribed, attested by the secretary, with the seal of the lodge attached; but no such change or transfer shall be of any validity until reported to the grand secretary and treasurer. Thus, it appears that the selection of the beneficiary is to remain subject to the will of the assured during his lifetime, and may be changed at any time. We think it is equally as evident that the mode of making the change is prescribed for the benefit of the order, and for the purpose of keeping the order at all times advised as to who are the beneficiaries, the mode of making the change requiring that the name of the new beneficiary shall be reported to the grand secretary and treasurer, that it may be entered upon the register of the grand lodge, and thus keep before the officers of the grand lodge, at all times, the names of those who are entitled to receive the money in the event of death.

Now, if we are correct in that construction of the constitution, that this provision is for the benefit of the order, and we think there can be no question on that, then, we say that there can be no question that the order could waive compliance with that provision, and if the order does waive compliance with that provision, according to well-settled principles of law, that provision would be treated as if it had never been incorporated in the contract. All provisions of a contract made for the benefit of one of the parties thereto, can always be waived by the party to be benefited thereby, and the failure to insist on such provision is conclusive evidence that the party to be benefited thereby does waive it, and paying money into court by the society is held by the authorities to be such evidence.

In *Tilworth* v. *Tilworth*, 20 Pac. Rep., 213, the facts in the case are these: A change was made during the last sickness of the assured, from the wife of the assured to his mother, by the

nurse writing a letter to the society, and filling up the form on the back of the certificate, by the direction of the assured. This entirely failed to meet the requirements of the constitution of the society. The society paid the money into court, and left the court to decide between the several complainants thereto. The court sustained the change, and said "that only the society could object on this ground; that the provision prescribing the mode of making the change was for the benefit of the society alone, and it alone could object to the failure to comply with the mode, and if the society did not object, no one else could."

In *Knights of Honor* v. *Watson et al.*, 15 Atl. Rep., 125, the facts were that one of the certificates was payable to Mrs. Lamprey. Mrs. Lamprey was not a member of the assured's family, nor in any way dependent on him. The constitution provided that the benefit could only be made payable to some member of the assured's family or person dependent on him, etc. The bill was filed by the society, which paid the money into court, and left the court to decide between the parties. The court said: "If the direction, by which the sum of $250 was payable to Mrs. Lamprey, was invalid because she was neither a member of the assured's family nor dependent on him, the benefit to that extent lapses, if the society so elects, for want of the valid exercise of the power of direction. But the question whether it was valid can be raised by no one but the society, and the society does not raise it. By paying the money into court, the society has expressed its willingness to have it paid to Mrs. Lamprey."

In *Brown, admr., et al.* v. *Monsus*, 5 Atl. Rep., 768, the court said: "The question in this case is between the legal representative of Charles Green, the assured, and the defendant, the person claiming the money." The association having paid the money into court, without objection to the equitable right of the defendant, the representative of Charles Green cannot insist upon any right which the association has waived. In sec. 308, vol. 1, of Bacon on Benefit Societies, the question is discussed.

We quote from that section as follows: ''Although the rule is settled that change of beneficiary must be made in the manner prescribed by the laws of the society, with some exceptions it is also now equally well settled that the society may waive compliance with the required formalities. In *Splawn* v. *Chew*, which was a controversy between the original beneficiary named in the certificate and the devisee of the same benefit in the will of the member subsequently made, the supreme court of Texas said: The right to change the disposition of [the] money being established in the member, the next question is, how is it to be exercised? It is contended by appellees that it can be exercised only in the manner pointed out in the third section of the third by-law, which reads as follows: ' Members may, at any time, when in good standing, surrender their certificate, and have a new one issued, payable to such beneficiary or beneficiaries dependent upon them, as they may direct, upon payment of a certificate fee of fifty cents.' This section is in further recognition of the right to make the alteration, and it seems to be admitted that a surrender of the old certificate and the issuance of a new one, under this section, would effect a change in the beneficiaries of the policy. But is this the only way in which such a change can be effected? The right to make the change is given by a different section of the by-laws, and exists in the insured so long as he remains a member of the order. A method by which he may accomplish it to the satisfaction of the order, is pointed out in the section last recited, but we do not consider this as exclusive of all other ways of effecting the same object. The design of this section is to protect the interests of the corporation. The company are entitled to know who are the parties entitled to the benefit money, and this is an effectual and certain means of giving that information. But, like all such provisions in the by-laws of private corporations, it may be waived at the option of the corporation, being for its benefit alone. This has been held in reference to such provisions when prescribed in mandatory terms. If they can be waived in such cases, much stronger

would seem to be the reason why this can be done when the course to be pursued is directed, as in this instance, in permissive language alone.     .     .     .     As by a by-law of the order this provision entered into the understanding between the company and the member effecting the insurance, and the rights of interested parties are not strengthened by the fact that the same provision is found in the certificate, it is still a condition for the benefit of the company, to be insisted upon or waived according to its election.     In a Kentucky case, the laws of the order provided that a member might, at any time, change the beneficiary by revoking the first designation and designating a new beneficiary in a form given on the back of the certificate, having the same attested by the recorder of the subordinate lodge, with its seal thereto attached, and paying a fee of fifty cents for a new certificate, which was thereupon to be issued by the supreme lodge, upon receipt from the local lodge of this old certificate, the attested revocation and the fee.     In this case the member had left the certificate in charge of the local lodge. Subsequently, he married, and wrote the lodge inclosing his dues and requesting the officer to send him the certificate made out to his wife.     No fee was sent, and the officer of the lodge wrote him for it.     Nothing was done until after the death of the member, when the recorder of the lodge certified the letter to the supreme lodge, which issued the new certificate, as requested, and afterwards paid it.     The suit was by the first beneficiary.     Judgment was given by the lower court for the defendant, and in affirming this, the court of appeals said: ' The appellant had but a contingent right to the benefit, and not a vested and absolute one.     It was subject to be defeated at the will of the assured. The law of the order, as above cited, provides how this shall be done.     The regulation is a reasonable one, but the question arises whether it shall govern, as between claimants to the benefit, when the order has seen fit to waive it.     We think not. Its object, beyond doubt, was to prevent the appellee from be-

coming involved in litigation with outside claimants.    Upon
this idea it was held in the case of the *Aid Society* v. *Lipold*,
that where the certificate provides, this certificate may be as-
signed and transferred only by and with the consent of the
association indorsed thereon, and it was done without such ap-
proval, it was a part of the contract, and that the society
had a right to insist upon the protection which it was intended
to afford.   The direction by the insured to change the benefit
was, in the case now under consideration, given through the
proper channel.    The subordinate lodge referred it to the
proper authority, and it saw fit to waive the regulations in-
tended for its benefit, and comply with the direction, although
made in an informal manner, and without the payment of the
fee.    The intention of the insured was to change the benefit.
He so directed in writing; and now because he did not do so in
the formal manner prescribed by the law for the benefit of the
order, it is asked by a third party, whose interest in the insur-
ance was liable to end at any time at the will of the assured, that
his intention shall be defeated, although the party for whose
benefit the form was prescribed, has seen proper to waive it.
Such a rule would sacrifice substantial justice to mere form;
it would tend to defeat the benevolent aim and purpose of the
organization, and the desire and intention of the assured.   Mem-
bers of the order may be remote from their lodge; they may
not have their certificates with them, and therefore be unable
to make the indorsement thereon as directed, or to have it at-
tested by the recorder of their lodge, or its seal attached
thereto.    If the appellee chooses to waive these formalities, it
does not lie in the mouth of a third party to complain.    The
order is entitled to know who is entitled to the benefit fund,
and the formal mode of changing its direction is for its benefit;
while, upon the other hand, the right of the beneficiary rests
in the mere will of the assured.   .   .   .    In our opinion the
letter of June 5, 1879, operated to change the direction of the
benefit, inasmuch as the appellee saw fit to waive its formali-

ties; and, as the assured had theretofore done all that was needed on his part, the fact that the appellee issued the new certificate after his death does not affect the right of the parties. If the appellee were in court with the fund, asking that the conflicting rights of the claimants to it be determined, and was silent as to the formality of the direction to change the benefit, it seems to us that the widow ought to prevail.' "

In the Kentucky case referred to by Bacon, the change was not made until after the death of the assured, yet the court held it valid and sufficient.

In the case of *Jory* v. *Legion of Honor*, 45 Am. St. Rep., the facts were these: The mother had insured her life for her daughter. Afterwards she wanted to give the insurance to her son. The daughter would not give the certificate to her, but she made an affidavit setting out the fact that the daughter refused to surrender the certificate, and asked to have it changed to the name of her son. The society refused to make the change, because the by-laws were not complied with. The by-law was in these words: " Such change to be made upon petition to the supreme secretary, signed by the member desiring to make the change, attested by the secretary of the subordinate council, and having the seal of the subordinate council attached, substantially in accordance with the form prescribed in this section. . . . The fee to be paid for a new certificate issued shall be one dollar, and must accompany the petition. No change of beneficiary shall be made in any other manner than herein prescribed; . . . provided, that in case of the loss or destruction of the old certificate, satisfactory evidence of such loss or destruction shall be produced, by affidavit or otherwise, before a new certificate be issued. . . . No act of a subordinate council, in the admission of any member to membership in this order, and no act of any member, done for the purpose of changing his or her beneficiary, shall be recognized by, or deemed binding upon, the supreme council, or as entitling the person admitted, or the new beneficiary named, to any benefits

from his order, unless such acts shall be in strict accordance with the provisions contained in the laws and constitution prescribed by the supreme council, nor until such acts have been ratified and approved. by the supreme council.'' In this case the society paid the money into court, and left the brother and sister to fight over it, and the supreme court say: '' If the Legion of Honor was here as an aggressive party, insisting, as against the claims of the son, upon a strict compliance with its by-laws before it could be compelled to take money from its treasury, possibly a different question would be presented; but, as between these parties litigant, the court will administer justice from the standpoint of equity, and bring to the solution of this question those broad principles upon the basis of which equity always deals. The general rule unquestionably is that a change of a beneficiary cannot be made by the insured unless a substantial compliance with the laws and regulations of the society is had, yet courts of equity have recognized various exceptions to this general principle, and the facts of this case bring it squarely within one of the well-recognized exceptions. This exception is builded upon the principle that equity does not demand impossible things, and will consider that done which ought to have been done, and is embraced within the proposition that when the insured complies with all the requirements of the rules for the purpose of making substitution of beneficiaries with which he has power to comply, he has done all that a court of equity demands.''

We think these authorities clearly establish the proposition that though the change is not made in accordance with the provisions of the constitution, yet this is an objection which can only be raised by the society itself, and that, as between the rival claimants for the fund, the court will consider what was the real purpose of the deceased, and carry out that purpose. The doctrine we have insisted upon above is sustained by our own supreme court in a case involving a transfer of stock in a corporation. We refer to the case of *Goyer* v. *Wilberger*,

71 Miss., 438.    In that case the court say: "It matters not that the transfer was not fully consummated, so far as relates to the action of the building and loan association, according to its by-laws.    They are for the benefit of the association, and not for creditors, who have no right to complain on this ground." There can be no question that, however binding may be the condition of a contract, yet, when its performance is found to have been waived by the party to be benefited thereby, the condition is to be treated as eliminated from the contract, and the contract is to be construed as if no such condition were in it. This is the rule prevailing in fire insurance, and it holds good in all cases.    See 2 Wood on Fire Insurance, sec. 525.

In this case the provisions of section 60 of the constitution were complied with, and the certificate was sent to the grand secretary and treasurer.    Upon proof the grand secretary and treasurer found the claim valid, and was willing to pay the money, but there being a contest about the money, he was un-willing to pay to either one of the claimants; but paying the money into court leaves the rival claimants to have the question decided between them.

Thus it appears that the selection of the beneficiary is to remain subject to the will of the assured during his lifetime, and that the mode of making the change can be waived by the society or order, and, when so waived, that provision will be treated as if never embraced in the contract.    Then it further appearing that the order recognized the validity of the claim, and paid the money into court without insisting upon a compliance with the form prescribed, and the case being dismissed as to the order, and the contract will stand as a contract in which the right to make the change was provided for, but no form or mode of making that change was prescribed by the contract, because, as said, if that provision of the contract has been waived by the order, it must be treated as if never having been incorporated in the contract.

Now, in contracts where the right to make the change is

recognized, but no mode of making the change is prescribed, the authorities hold that the change may be made in any mode which indicates the wish or intention of the assured. In 1 Bacon on Benefit Societies, section 308*a*, it is said: "If no formalities are required by the laws of the society for change of beneficiary, it may be made in any way indicating the intention of the assured." The author then cites a case where the assured signed a paper expressing his intention, which was mailed to the society, but did not reach its destination until after the assured's death. This was held to be a change, though the certificate was in the possession of the original beneficiary. The court in this case said: "The change of beneficiary in such a case is a mere direction to the society, which it is bound to obey."

In *National American Association* v. *Kirgin*, 20 Mo. Appeal, referred to by Bacon in section 309, the assured was seriously injured, and desired a friend to take his certificate to the secretary of the lodge and have it changed. The friend applied to the secretary, but no action was taken until the next day, when a new certificate was issued, but the assured was then dead, but it was held that the change was complete.

In view of these authorities, we call the court's attention now to the fact disclosed by the testimony, as to what was done by the assured, and by others, in the making of the change claimed in this case.

The answer of defendants admits all the allegations of the bill, except the allegation that Seay was never in Vicksburg between the date of his mother's death and that of his own, so that he could have had access to his benefit certificate in order to make the change from his mother to his sister, by filling up the form on the back of the certificate, and denies further, that before his death he made any effort to make such change in the manner indicated by the bill.

To these two issues of fact, the testimony of appellee is addressed, and from that testimony the following facts clearly appear: That George M. Seay was working as a fireman on the

Yazoo & Mississippi Valley Railroad, between Memphis and Vicksburg; that, from the third day of August, the day of his mother's death, to the eighteenth day of the same month, the date of his own death, his work was on a part of the road which kept him continuously out of Vicksburg; and that, during nine of those days, from Friday of one week to and including Saturday of next week, he was sick in Memphis, and that he had never seen his benefit certificate, the original certificates having been called in, and new certificates having been issued and sent to the subordinate lodges for delivery to the members, and as the witness, Porter, says, he did not think that Seay's certificate had been in the subordinate lodge very long at the time of his mother death; that a few days before he was taken sick, he received a letter saying that his mother was dead.

It is further shown by the deposition of Porter, and the two other witnesses from Memphis, that he was very anxious to have the insurance money paid to his sister, the appellee, and that he gave as his reason therefor that she had nursed his mother during her sickness, and that, on Wednesday before his death, when, according to Porter, he had a relapse and began to fear a fatal termination of his disease, he began to urge Porter, also a member of the order and his room mate, to come to Vicksburg and have the certificate changed, and Porter made every effort to get off, but could not until Saturday morning, the day of his death; that Seay then tried to write out what he wanted done, but could write only the name of his sister, saying that he was so nervous that he could not write, and that Porter immediately left Memphis and went to Vicksburg, reaching there at 7:30 o'clock, P.M., on Saturday, August 18; that this was the regular meeting night of the lodge at Vicksburg, of which Porter was a member, and which fact he knew; that he went to the lodge room and found no one there; that he then went around and tried to find the members, but could find only three; that the certificate was in the desk of the secretary, and he could not get it to make the entry on the back; that the

lodge failed to meet, although it was the regular meeting night, and that Seay died at 11:55 P.M. of that day.

On page 20 of the record Porter speaks as follows: "On Wednesday, before his death on Saturday, he asked me to come to Vicksburg and have his policy changed to his sister, Mrs. Emma Allen. He said he did not think he would be able to come down. I asked for leave of absence so that I could come, but Mr. O'Rourke, the master mechanic, did not relieve me until Saturday morning, and then I came down here to have it changed. He gave me directions to have it changed—gave me her address, and told me he wanted it made to his sister, Mrs. Emma Allen, and that she was to have all over and above his expenses and indebtedness. He wanted me to pay all of his indebtedness."

The agreed statement of facts shows that he told Shaw, who induced him to insure, that in case of his mother's death, he wanted his sister to have the insurance money. The certificate sent to the grand secretary and treasurer has written on it a transfer, filled up and attested by the secretary of the subordinate lodge. This was done after the death of Seay, and without a request from him, but done by the secretary because he believed that in so doing he was carrying out Seay's wishes, and the certificate was sent to the grand secretary and treasurer in this condition, as appears by the certificate itself.

The above facts are testified to by witnesses of their own knowledge, and whose testimony is unquestioned in the case, and this testimony is confirmed by the testimony of witnesses in Georgia, by whom it is shown that Seay and his sister were the youngest children, and that, before he left home, he and his sister and mother lived together as one family, supported by him; that after his sister's marriage she went with her husband, and that, at the urgent solicitation of the mother, the sister and her husband returned and lived with the mother, who was sick all the time, and took care of and waited on her in her sickness. The testimony clearly confirms what the witness said was the

reason given by Seay for wishing his sister to have the insurance money, that she had waited on his mother in her sickness.

This testimony, we think, clearly shows these facts: (1) That the sister was the person for whom the assured would most likely provide, for the reason given by himself and others; (2) that it was impossible, after the time when he heard of his mother's death, for George Seay to have filled up the printed form on the back of the certificate, which was in the lodge room in Vicksburg, and which had never been delivered to him; (3) that his acts and language clearly show that he did make the transfer, and that when Porter left Memphis, he did not leave to make the transfer, but simply to get the certificate, and put in written form, not the transfer, but simply the evidence of the transfer, the transfer having been made when Seay told Porter that he wanted him to pay his debts and expenses, and wanted the balance of the money to go to Mrs. Allen, and directed him to go to Vicksburg and have the transfer put in form.

Unless there was something in the law (which there is not) requiring the transfer to be evidenced by writing, then, if we are correct in the position that the society has waived the provision of the contract as to the formalities to be observed in the transfer, and that no one else can insist upon that provision, it follows that the transfer might have been made and established in any way, and by any proof which tended to show what was the purpose, intention, and desire of the assured in that which he did and said.

Now, the question as to whether what he did and said evinced a purpose on his part to give the insurance money to his sister, his mother being dead, was a question of fact upon which the chancellor has passed, and the verdict of the chancellor upon those facts are to be treated as the verdict of a jury, and will not be set aside where there is testimony tending to establish the fact found by the chancellor. In such cases, the presumption in favor of the decree reaches the conclusions of the chan-

-cellor, both in favor of the law and the facts.  *Partee* v. *Bedford*, 51 Miss., 84, 90.

But if mistaken in this view of the case—if, indeed, it be true that appellants can insist upon a compliance with the terms of the contract, notwithstanding the fact that the society has waived those conditions—still this cannot avail appellants, for the reason that the record does not present a case of mere change of beneficiary, and the provisions of the contract as to the mode of making that change, can cut no figure in this case.  When the mother died, all her interest in the fund, which was merely an interest contingent upon the assured dying before she died, ceased.  Bacon on Benefit Societies, vol. 1, secs. 234 and 304.

We quote from this section as follows: "In event of the death of the party designated, in the lifetime of the member of the society, then there is also a failure of the exercise of the power, and unless the contract provides otherwise, or there is another designation of a person entitled to take, the power lapses, and the society takes by reversion.  This rule has always been applied, etc.  .  .  .  Other old cases are to the same effect.  Modern authority follows the older precedents."

We quote again from the same section as follows: On page 442 it is said (quoting from a decision), " We think, therefore, the meaning of the language used by the husband in designating the beneficiary was that the benefits of this provision were to go to his wife only in case she survived him, and, as she did not survive her husband, the provision falls to the ground so far as she is concerned, and the claims of her representatives are out of the question."

In section 243*a* it is shown that the court, in order to prevent an entire failure of the benefit, have raised a resulting trust in favor of the assured.  In other words, if the beneficiary dies before the assured, then the certificate represents only the claim of the assured against the society, which, if not assigned or disposed of by the assured, would, like any other chose in action, descend to his heirs.  This being true, the assured's

right to dispose of this claim, after the death of his mother, was absolute, not even affected by the contingent interest of his mother. Now, if it be true that, after the death of the mother, the certificate stood, in contemplation of law, as if payable to the assured, his heirs, etc., the transfer to the new beneficiary can be made in any way which will indicate the assured's purpose, and the certificate could be transferred to Mrs. Allen, either directly, or to another in trust for her by way of assignment, like any other chose in action. We quote from some authorities on this point, as follows:

In the case of *Brown, admr., et al.*, v. *Monsus*, 5 Atl. Rep., 768, *supra*, the court say: "The certificate is a chose in action, and assignable by parol. The fact that it provides that it may be assigned, with the consent of the association, and an action maintained thereon by the assignee, is simply an adoption of the common law." In this case the certificate was payable to the assured, his heirs, administrator, etc. It had been assigned simply by delivery, to make provision for the support of certain parties. The mother of these parties held it as trustee for them. The bill was filed by the widow, administrators, and heirs of the assured against this woman, in order to get possession of the certificate, but the court denied the relief, and held that the assignment by parol vested the right in the woman as trustee for the benefit of her children, and that the widow and children, or administrator of the assured, had no right to the fund. In this state a chose in action may be assigned without writing, so as to vest in the assignee the right to sue in her own name in a court of equity. See George's Digest, under head of assignments, p. 23, art. 7.

In 8 Am. & Eng. Enc. L., p. 1322, it is said: "It seems formerly to have been adopted that the gift of a chose in action, unless by some document payable to bearer, required an assignment or some equivalent transfer, and that the transfer must be actually executed. It is now held, with substantial unanimity, that a written assignment is not necessary in such cases, and

that the delivery of a chose in action, under such circumstances as would constitute a gift of personal property in possession, amounts to an equitable assignment of the property represented, which the courts will recognize and uphold.'' In a note on same page it is said: ''Any act on the part of the owner of a chose in action, showing not only a present intention to transfer, but that he regarded himself as having carried his intention into effect, is sufficient without written evidence of the transaction.''

In another note, on same page, he quotes from a Connecticut case, as follows: ''A party delivered to his niece living with him a certificate for ten shares of stock in an insurance company, standing in his own name, saying that he made her a present of it. Afterwards the company issued forty shares additional stock, and he delivered these to his niece, saying they were hers. He drew the dividends during his lifetime. It was held that the delivery of the certificates, with the intention to pass title, amounted to an equitable assignment of the shares which a court of equity would uphold, and that the fact that the by-laws of the company provided that transfers of stock shall be made only at the office of the company, by the shareholder or his attorney, on surrender of the certificate, does not alter the case. This provision only relates to the legal title. In an equitable assignment, the assignor, retaining the legal title, becomes trustee for the assignee.''

In this case, there was a delivery of the certificate to Porter for the benefit of Mrs. Allen. This could be done. 8 Am. & Eng. Enc. L., 1318. It is not necessary that there should be a manual delivery. There can be a constructive delivery. *Ib.*, 1320.

In a note, on this page, this case is given: The donor being ill at plaintiff's house, delivered to plaintiff certain keys, and, at the same time, said: '' I give you the chest that is over at Sargent Rowe's, and all that is in it.'' This was held a valid gift of the chest and its contents.

On the same page, ''A woman confined to her bed delivered

to the plaintiff, who had taken care of her for many years, the keys of her bureau and trunks, accompanied by words of gift. Held, that the delivery of the keys, and the language of the donor, carried out her intention, and placed the donee in possession of the means of assuming absolute control of the contents at her pleasure, and constituted a valid gift of the coin and jewelry in the trunks and bureau, and, the fact that the trunks and bureau were not removed, or even handled, was not a controlling circumstance." The test of the delivery is, that the donor parts with dominion over the thing, and puts it in the power of the donee to take possession of it when he can get at it.

In the case at bar, the deceased directed Porter to go to Vicksburg and get the certificate from the lodge, have the transfer made, and pay his debts and expenses, and give the balance of the money to Mrs. Allen. This gives Porter all the power that the deceased himself would have had with regard to the certificate, and vests in Porter absolute dominion over the certificate. But the authorities hold that there is another mode of transferring choses in action without even delivery, and without writing, and that is by way of trust.

On page 1323, Am. & Eng. Enc. L., vol. 8, it is said: "The title to choses in action, as well as that of any other class of property, may be voluntarily transferred in another manner, without even delivery, and that is by a declaration of trust. The title to a chattel may ordinarily be transferred by way of gift, as we have heretofore seen, by a delivery of the article, actually or constructively, to the donee, or to some person in trust for him. It is also possible for the donor to constitute himself a trustee for the donee. . . . If the trust is perfectly created, so that the donor or settlor has nothing more to do to create it, and the party seeking to enforce it has no need of further conveyance from the settlor, and nothing is required of the court but to give effect to the trust as an executed trust, it will be carried into effect, although it was without consideration, and the possession of the property was not changed."

On page 1318 of the same volume, an Indiana case is referred to where it is said: ''If the trust is created,.the gift will be valid although it be not contemplated that the delivery is to be made until after the death of the donor.'' In that case bonds and money were delivered to a, party with direction to give them to the children of the donor after his death, and it was held that this was a sufficient delivery to constitute a complete gift, and that an action would lie in favor of the children against the trustee after the donor's death. And there are numerous other cases to the same effect on the same page.

In the case at bar, a complete trust was created in Porter by the acts and language of the deceased. The deceased contemplated the approach of death, and gives Porter full power to go to Vicksburg and get the certificate, have it changed, collect the money, pay his debts and expenses, and give the balance to Mrs. Allen. This created Porter a trustee for the purposes expressed, and by giving him authority to take possession of the certificate, and thus constructively delivered it to him, and vested him with title .to it. The trust is valid, though the donee had no knowledge of it when done if she accepts when it becomes known to her. 8 Am. & Eng. Enc. L., 1324.

But, conceding that we were mistaken in our contention, as above set forth, and in the further contention that the society, having waived the objection, a third party could make it, the question recurs whether or not, if the society itself were making the objection, what was done by Seay was sufficient, in contemplation of a court of equity, to operate as an assignment.

It is conceded that if Seay did all that could be required' of. him under the circumstances, to carry out the provisions of the constitution with regard to a change of beneficiary, that a court of equity would treat the change as having been made, though the formalities prescribed had not been complied with; but it is contended that Seay did not do all that would be required of him under the circumstances in this particular case, and the contention is that it was not shown that the secretary was not

in town, that it was not necessary that there should be a meeting of the lodge to formally consent to the change, but that the secretary was the party to be seen, and that Porter, not having shown that the secretary was not in town, it cannot be said that Seay did all that could be required of him under the circumstances.

To repeat, briefly, the circumstances, we find that the certificate was not in Seay's possession, because the certificate which he held had been called in by the society and a new certificate issued and sent to the subordinate lodge about two weeks before his death, and that during that time he had not been in the city, his business keeping him elsewhere, and that the subordinate lodge had never delivered to him, as the constitution required it to do, this new or substituted certificate, but that the same was in the custody of the secretary of the lodge, and locked up in the lodge room.

Now Porter says that he went around to see how many members he could find, and also went to the lodge room, and he could not get in there. This clearly shows that Porter could not find the secretary, because if he had found him, he could have gotten in the lodge room. It clearly shows, also, that he made a search for the secretary. Now, for the purposes of this case, if Porter could not find the secretary, after search for him, he had just as well been out of town. While Porter does not say where he went to look for the secretary, he does say that he could not find him, and for that reason he could not get in the lodge because he had the keys, and it is presumed that he, being a member of the same lodge, knew where the place of residence of the secretary was, and that he must have gone to the places of residence of the members, or the places where he expected to find them, including the secretary. And if, after diligent search, he could not find the secretary, though he might have been in town, he could not have carried out the formalities required by the constitution, and the reason why these formalities could not be carried

out was not that Seay nor Porter did not do all that they were required to do to carry them out, but that the society itself absolutely prevented them from being carried out by keeping the certificate when it should have been delivered to Seay; by failing to have the lodge room open at the time that, according to its rules, it was required to be open, and its officers present, and by reason of the further fact that, notwithstanding this default on the part of the society, the officer in whose custody the certificate was, could not be found by the party who was seeking to get possession of that certificate in order to make the change thereon.

We insist that the society itself, under these circumstances, if, in court, contending that the change had not been made according to its constitution, would be estopped to insist upon that objection, because to do so, the society would be permitted to avail itself of its own delinquency.

WHITFIELD, J., delivered the opinion of the court.

The payment of the money into the bank had the effect to remit the legal question of who was the rightful claimant of the fund arising from the benefit certificate, to the court.   It had no effect as between the rival claimants, but it did operate a waiver by the order, so far as its rights were concerned, of conformity of the change in the benefit certificate to the provisions of section 66 of the constitution of the grand lodge, so long, at least, as the order did not appear as a party resisting the payment.   The order is no party here; does not set up such want of conformity, and no other party can, in such case, invoke the said section 66, intended alone for the protection of the order.   *Tilsworth* v. *Tilsworth*, 20 Pac. Rep., p. 213.

On the facts of record, we think the insured intended to make the change in the beneficiary in accordance with section 66, and manifested that intention by doing all he could do towards that end, situated as he was.   He wrote the name, Emma Allen, in the note book of his selected agent, but, from physical inability,

could write no more.   He seems not to have been able to write the day he died, or, perhaps, the day before.   He gave full verbal instructions and authority to Porter.   His certificate was not in his possession—the old one having been exchanged for a new one—but was locked up in the desk of the secretary of the subordinate lodge at Vicksburg, so that he could not personally comply with section 66.   He had not been in Vicksburg for two weeks prior to his death, and the new certificate, which it was the duty of the subordinate lodge to deliver to him, had been, for two weeks, in the custody of the secretary of that lodge.

The intention that the sister, Mrs. Emma Allen, should be the beneficiary, is abundantly shown, and the reason therefor. On this state of case we approve and adopt the language of the supreme court of Texas, in *Splawn* v. *Chew*, 60 Tex., pp. 536, 537: "A method by which he may accomplish it [the change in the beneficiary], to the satisfaction of the order, is pointed out in the section last recited, but we do not consider this as exclusive of all other ways of effecting the same object.   The design of this section is to protect the interests of the corporation.   The company is entitled to know who are the parties entitled to the benefit money, and this is an effective and certain means of giving that information.   But, like all such provisions in the by-laws of private corporations [the order being the American Legion of Honor, a mutual benefit order, as here], it may be waived at the option of the corporation, being for its benefit alone."

Seay, having repeatedly declared his intention that his sister, Mrs. Emma Allen, should be the substituted beneficiary, and having actually done all he could in his condition to accomplish that purpose, and to accomplish it in the very mode prescribed by section 66, his acts being partly in writing and partly in parol, equity will treat that as done which ought to have been done, and decree as if the change had been made in conformity with said section.   It will perfect his imperfect and incomplete, but partly accomplished, purpose, and act and deal with it as

perfected, as between these claimants.    The case falls strictly within the second and third exceptions to the general rule pointed out by Justice Brown, now of the United States supreme court, in *Supreme Conclave, etc.*, v. *Coppella*, 41 Fed. Rep., p. 1, cited in 1 Bacon on Ben. Socs., section 310*a*.    And in such case it is well settled that the death of the assured, before the completion of the change in the beneficiary, makes no difference.    The authorities following thoroughly settle the correctness of these views: *Splawn* v. *Chew, supra; Schmidt* v. *Iowa K. P. Ins. Assn.*, 82 Ia., 304; *Tilsworth* v. *Tilsworth, supra; Nat. Assn., etc.*, v. *Kirgin*, 28 Mo. App., 80; *Rollins* v. *McHatton*, 16 Col., 207, 208; *Knights of Honor* v. *Watson*, 15 Atl. Rep., 125; *Brown* v. *Monsus*, 5 Atl. Rep., 768; 1 Bacon on Ben. Socs., sections 310, 310*a*.

There are other views leading to the same conclusion we have announced, and a multitude of authorities could be marshaled. But the briefs of the very able counsel for appellant and appellee, present their various contentions with such unusual clearness and force, and marshal the authorities with such discriminating accuracy in support of these contentions, that the profession will get from them, when published in full, as we now direct them to be by the reporter, all the light we could throw upon the subject by any further elaboration.

*Affirmed.*